Nos. 15-4163 & 15-4187

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

RYAN PYLE,
*Plaintiff-Appellant*,

v.

JAMES WOODS, et al.,
*Defendants-Appellees*.

MARLON JONES,
*Plaintiff-Appellant*,

v.

JAMES WOODS, et al.,
*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Utah
No. 2:15-CV-143 (*Pyle*), Hon. Tena Campbell, U.S. District Judge
No. 2:15-CV-278 (*Jones*), Hon. Ted Stewart, U.S. District Judge

**BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION OF UTAH,
AMERICAN CIVIL LIBERTIES UNION OF COLORADO,
AMERICAN CIVIL LIBERTIES UNION OF KANSAS,
AMERICAN CIVIL LIBERTIES UNION OF NEW MEXICO,
AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA, AND
AMERICAN CIVIL LIBERTIES UNION OF WYOMING
AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS**

Nathan Freed Wessler
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
nwessler@aclu.org

(Additional counsel on back)

Leah Farrell (USB No. 13696)
John Mejia (USB No. 13965)
ACLU of Utah Foundation, Inc.
355 North 300 West
Salt Lake City, Utah 84103
Phone: (801) 521-9863
Fax: (801) 532-2850
lfarrell@acluutah.org
jmejia@acluutah.org

Mark Silverstein
Sara R. Neel
American Civil Liberties Union
     Foundation of Colorado
303 E. 17th Avenue, Suite 350
Denver, Colorado 80203
Phone: (720) 402-3114
msilverstein@aclu-co.org
sneel@aclu-co.org

Stephen Douglas Bonney
ACLU Foundation of Kansas
6701 W. 64th Street, Suite 210
Overland Park, Kansas 66202
Phone: (913) 490-4102
dbonney@aclukansas.org

Alexandra Freedman Smith
ACLU of New Mexico Foundation
P.O. Box 566
Albuquerque, New Mexico 87103-
     0566
Phone: (505) 266-5915 Ext. 1008
Fax: (505) 266-5916
asmith@aclu-nm.org

Brady R. Henderson, OBA#21212
ACLU of Oklahoma Foundation
3000 Paseo Drive
Oklahoma City, Oklahoma 73103
Phone: (405) 525-3831
Fax: (405) 524-2296
bhenderson@acluok.org

Courtney A. Bowie*
American Civil Liberties Union of
     Wyoming
P.O. Box 20706
Cheyenne, Wyoming 82001
Phone: 307-637-4565
Fax: 605-332-5648
cbowie@aclu.org

*admitted in Alabama, Mississippi and
Massachusetts (inactive)

## Corporate Disclosure Statement

No *amici* have parent corporations or are publicly held corporations.

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Circ. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned or viruses with the most recent version of a commercial virus scanning program, Sophos Anti-Virus 9.4.2, updated 3/30/16, and according to the program are free of viruses.


March 30, 2016                    ___s/ Leah Farrell_____
                                  Leah Farrell
                                  lfarrell@acluutah.org
                                  ACLU of Utah
                                  355 N 300 W
                                  Salt Lake City, UT 84103
                                          (801) 521-9862

## Table of Contents

Corporate Disclosure Statement ............................................................. i

Table of Authorities .......................................................................... iii

Glossary of Acronyms and Abbreviations ............................................. xi

Statement of *Amici Curiae* ................................................................ xii

Authority to File *Amicus Brief* ......................................................... xiii

Summary of Argument ....................................................................... 1

Argument ........................................................................................ 2

    I.    The Court Should Hold That Appellants' Constitutional Rights Were Violated By Warrantless Access To Their Prescription Records. ................................................................................ 2

    II.    People Have a Reasonable Expectation of Privacy in their Prescription Records and the Confidential Medical Information Those Records Reveal. ..................................................... 11

        A.    The Utah Controlled Substance Database contains large volumes of sensitive and private medical information. ............... 13

        B.    The confidentiality of patient health information is protected by longstanding ethical rules that were known to the framers of the Fourth Amendment and continue in force today. ............... 18

        C.    State laws protect the privacy of patient medical information, including by requiring probable cause for law enforcement access to prescription records. ................................. 23

        D.    A state's limited ability to access records in a PDMP does not eliminate patients' reasonable expectation of privacy in those records .................................................................. 26

Conclusion .................................................................................... 30

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a) .................... 33

APPENDIX ..................................................................................... 34

CERTIFICATE OF SERVICE .............................................................. 74

# Table of Authorities

## Cases

*Arizona v. Gant*, 556 U.S. 332 (2009) ....................................................12

*Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020 (2011) ................................4, 11

*Chapman v. United States*, 365 U.S. 610 (1961)....................................................28

*Charnes v. DiGiacomo*, 612 P.2d 1117 (Colo. 1980)..........................................7

*City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015) .............................................12

*Commonwealth v. Riedel*, 651 A.2d 135 (Pa. 1994)..............................................25

*DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir. 1985) ............................... 26, 27

*Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000)....................................................28

*Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133 (3d Cir. 1995)....................................17

*Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005) .............................................17

*Elkins v. United States*, 364 U.S. 206 (1960). .........................................................23

*Elwell v. Byers*, 699 F.3d 1208 (10th Cir. 2012) ......................................................3

*F.E.R. v. Valdez*, 58 F.3d 1530 (10th Cir. 1995) ....................................................28

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001)....................................... 22, 27

*Florida v. Jardines*, 133 S. Ct. 1409 (2013)............................................................28

*Holmes v. State*, No. 2:12-cv-01098 TS, 2014 WL 2645381 (D. Utah June 13, 2014)............................................................................................................................8

*In re Application of U.S. for an Order Directing a Provider of Electronic Communication Service to Disclose Records to Government*, 620 F.3d 304 (3rd Cir. 2010).......................................................................................................27

*Katz v. United States*, 389 U.S. 347 (1967) .............................................................28

*King v. State*, 535 S.E.2d 492 (Ga. 2000)....................................................... 21, 24

*Kyllo v. United States*, 533 U.S. 27 (2001)..............................................................28

*New York v. Belton*, 453 U.S. 454 (1981)..................................................................3

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ..............................................................12

*Oliver v. United States*, 466 U.S. 170 (1984) .........................................................12

*Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.*, 998 F. Supp. 2d 957 (D. Or. 2014), *appeal pending*, No. 14-35402 (9th Cir.) ................................................................................................ passim

*Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.*, No. 3:12-cv-02023-HA, ECF No. 63 (D. Or. Mar. 12, 2014)................10

*Pearson v. Callahan*, 555 U.S. 223 (2009)..................................................... 3, 4, 11

*Saucier v. Katz*, 533 U.S. 194 (2001) .......................................................................3

*Smith v. Maryland*, 442 U.S. 735 (1979) ...............................................................27

*State v. Copeland*, 680 S.W.2d 327 (Mo. Ct. App. 1984) ......................................25

*State v. Jones*, No. 131904471 (3d Dist. Ct., Salt Lake Cty., Utah, Apr. 16, 2014).......................................................................................................................8

*State v. Nelson*, 941 P.2d 441 (Mont. 1997) .........................................................25

*State v. Pyle*, No. 131910379 (3d Dist. Ct., Salt Lake Cty., Utah, July 31, 2014)8, 9

*State v. Skinner*, 10 So. 3d 1212 (La. 2009) .........................................................24

*Stoner v. California*, 376 U.S. 483 (1964)..............................................................28

*Tennessee v. Garner*, 471 U.S. 1 (1985)................................................................23

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004)..............................27

*U.S. Dep't of Justice v. Colo. Bd. of Pharmacy*, No. 10-cv-01116-WYD-MEH, 2010 WL 3547898 (D. Colo. Aug. 13, 2010) ......................................................10

*United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999) .......................................29

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010)....................................................................................................................29

*United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108 (9th Cir. 2012) ...........27

*United States v. Jacobsen*, 466 U.S. 109 (1984).....................................................28

*United States v. Jones*, 132 S. Ct. 945 (2012) .......................................................29

*United States v. Miller*, 425 U.S. 435 (1976) .................................................. 26, 27

*United States v. Phillips*, 458 F. App'x 757 (10th Cir. Feb. 1, 2012) ......................9

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)........................................28

*United States v. Watson*, 423 U.S. 411 (1976) ......................................................23

*Virginia v. Moore*, 553 U.S. 164 (2008)................................................................23

*Whalen v. Roe*, 429 U.S. 589 (1977) ..................................................22

*Wilson v. Layne*, 526 U.S. 603 (1999) ...............................................4

**Statutes & Rules**

21 U.S.C. § 812 ..................................................................................14

42 Pa. Cons. Stat. Ann. § 5929 ..........................................................25

42 U.S.C. §§ 2000aa-11 ......................................................................26

5 R.I. Gen. Laws Ann. § 5-37.3-4 ......................................................25

735 Ill. Comp. Stat. Ann. 5/8-802 ......................................................25

Ala. Code § 20-2-214 ..........................................................................23

Alaska R. Evid. 504 ............................................................................25

Alaska Stat. § 17.30.200 .....................................................................24

Ariz. Rev. Stat. Ann. § 12-2235 .........................................................25

Ark. Code Ann. § 20-7-606 ................................................................24

Ark. R. Evid. 503 ...............................................................................25

Cal. Evid. Code §§ 990–1007 .............................................................25

Colo. Rev. Stat. § 12-42.5-403 ...........................................................4

Colo. Rev. Stat. § 12-42.5-404 ...........................................................7

Colo. Rev. Stat. § 13-90-107 ..............................................................25

Conn. Gen. Stat. Ann. § 52-146o ........................................................25

D.C. Code Ann. § 14-307 ...................................................................25

Del. Unif. R. Evid. 503 ......................................................................25

Fla. Stat. Ann. § 456.057 ...................................................................25

Ga. Code Ann. § 16-13-60 .................................................................24

Ga. Code Ann. § 24-12-1 ...................................................................25

Haw. Rev. Stat. § 626-1, Rule 504 .....................................................25

Idaho Code Ann. § 9-203.4 ................................................................25

Ind. Code Ann. § 34-46-3-1 ...............................................................25

Iowa Code § 124.553 ....................................................................24

Iowa Code Ann. § 622.10 ............................................................25

Kan. Stat. Ann. § 22-2502 .............................................................7

Kan. Stat. Ann. § 60-427 .............................................................25

Kan. Stat. Ann. § 65-1683 .............................................................4

Kan. Stat. Ann. § 65-1685 .......................................................7, 24

La. Code Evid. Ann. art. 510 .......................................................25

Me. R. Evid. 503 ..........................................................................25

Me. Rev. Stat. tit. 22, § 7250 .......................................................24

Mich. Comp. Laws Ann. § 600.2157............................................25

Minn. Stat. § 152.126 ...................................................................24

Minn. Stat. § 595.02 .....................................................................25

Miss. Code Ann. § 13-1-21 ..........................................................25

Mo. Ann. Stat. § 491.060 .............................................................25

Mont. Code Ann. § 26-1-805 .......................................................25

Mont. Code Ann. § 37-7-1506 ......................................................24

Mont. Code Ann. § 46-4-301 ........................................................24

N.C. Gen. Stat. Ann. § 8-53 .........................................................25

N.D. R. Evid. 503 .........................................................................25

N.H. Rev. Stat. Ann. § 318-B:35 ..................................................24

N.H. Rev. Stat. Ann. § 329:26 ......................................................25

N.J. Stat. Ann. § 2A:84A-22.2 .....................................................25

N.M. R. Evid. 11-504 ...................................................................25

N.Y. C.P.L.R. 4504 ......................................................................25

Neb. Rev. Stat. § 27-504 ..............................................................25

Neb. Rev. Stat. § 71-2455 ............................................................24

Nev. Rev. Stat. Ann. §§ 49.215–49.245 ......................................25

Ohio Rev. Code Ann. § 2317.02...................................................25

Okla. Stat. Ann. tit. 12, § 2503 ................................................................25

Okla. Stat. tit. 63, § 2-309C ......................................................................4

Okla. Stat. tit. 63, § 2-309D .......................................................................7

Or. Rev. Stat. § 40.235 ..............................................................................25

Or. Rev. Stat. § 431A.865 .........................................................................24

R.I. Gen. Laws § 21-28-3.32 .....................................................................24

S.D. Codified Laws § 19-13-6 ...................................................................25

Tex. R. Evid. 509 ......................................................................................25

Utah Code Ann. § 58-37-2 .........................................................................14

Utah Code Ann. § 58-37-4 .........................................................................14

Utah Code Ann. § 58-37f-201 ....................................................................13

Utah Code Ann. § 58-37f-203 ...............................................................4, 14

Utah Code Ann. § 58-37f-301 .........................................................7, 18, 24

Utah Code Ann. § 58-37f-601 ....................................................................17

Utah Code Ann. § 78B-1-137 ....................................................................25

Va. Code Ann. § 8.01-399 .........................................................................25

Vt. Stat. Ann. tit. 12, § 1612 .....................................................................25

Vt. Stat. Ann. tit. 18, § 4284 .....................................................................24

Wash. Rev. Code Ann. § 5.60.060 .............................................................25

Wis. Stat. Ann. § 905.04 ...........................................................................25

Wyo. Stat. Ann. § 1-12-101 .......................................................................25

Wyo. Stat. Ann. § 35-7-1060 ..................................................................4, 6

## Regulations

45 C.F.R. § 160.202 ...................................................................................26

45 C.F.R. § 160.203 ...................................................................................26

45 C.F.R. § 164.512 ...................................................................................26

N.M. Code R. § 16.19.29.8 ..........................................................................4

N.M. Code R. § 16.19.29.9 ......................................................................6

Utah Admin. Code r. 156-37f-203 .........................................................14

Wyo. Rules & Regs., Dep't of Admin. & Info., Bd. of Pharmacy, Ch. 8, § 3 .........6

**Other Authorities**

Bernard Friedland, *Physician-Patient Confidentiality*, 15 J. Legal Med. 249 (1994) .................................................................................................18

Carl Flansbaum, *New Mexico's Prescription Monitoring Program*, presented at New Mexico Nurse Practitioner Council 2015 Annual Conference (2015), https://c.ymcdn.com/sites/www.nmnpc.org/resource/resmgr/2015_Conference/Flansbaum_-_PMP.pdf. & http://www.nmnpc.org/?page=2015PostConf .........5

Colorado Dep't of Regulatory Agencies, *Prescription Drug Monitoring Program (PDMP): News*, Utilization Statistics, https://www.colorado.gov/pacific/dora/PDMP_News#UtilizationStats ...............5

Dennis Romboy, *Unwarranted Drug Database Search Prompts New Utah Law*, *Lawsuits*, Deseret News, Apr. 23, 2015, http://www.deseretnews.com/article/865627152/Unwarranted-drug-database-search-prompts-new-Utah-law-lawsuits.html?pg=all..........................23

Editorial, *Don't Let DEA Bypass Judges and Search Warrants*, Salt Lake Trib., July 4, 2015, http://www.sltrib.com/opinion/2691649-155/editorial-dont-let-dea-bypass-judges .......................................................................10

*HIV in the United States: At A Glance*, Centers for Disease Control & Prevention (Sept. 29, 2015), http://www.cdc.gov/hiv/statistics/basics/ataglance.html ....................................15

Institute for Health Freedom & Gallup Organization, *Public Attitudes Toward Medical Privacy* (Sept. 26, 2000), http://www.forhealthfreedom.org/Gallupsurvey/IHF-Gallup.pdf ......................22

Institute of Medicine of the National Academies, Committee on Advancing Pain Research, Care, and Education, *Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research* (2011), http://books.nap.edu/openbook.php?record_id=13172 .......................................15

*Insufficient Sleep is a Public Health Epidemic*, Centers for Disease Control & Prevention (Sept. 3, 2015), http://www.cdc.gov/features/dssleep/......................15

Lawrence O. Gostin, *Health Information Privacy*, 80 Cornell L. Rev. 451 (1995) ...................................................................................................21

Marshall Griffin, *Battle Over Prescription Drug Monitoring Renewed for 2016 Missouri Legislative Session*, St. Louis Public Radio, Dec. 17, 2015, http://news.stlpublicradio.org/post/battle-over-prescription-drug-monitoring-renewed-2016-missouri-legislative-session ..........................................................4

Marvin H. Sims, C.S. DataBase Administrator, *Utah's Controlled Substance Database Program* (Sept. 18–19, 2012), http://www.pdmpassist.org/pdf/PPTs/West2012/3_Sims_NewInitiatives.pdf..5, 9

Nat'l Institute of Mental Health, Nat'l Institutes of Health, *Anxiety Disorders* (2009), https://www.nsu.edu/Assets/websites/counseling-center/resources/Anxiety-Disorders-Fact-Sheet.pdf...........................................15

New London Consulting & FairWarning, *How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes* (Sept. 13, 2011), http://www.fairwarning.com/whitepapers/2011-09-WP-US-PATIENT-SURVEY.pdf ...........................................................................................19

New Mexico Dep't of Health, *New Mexico Prescription Monitoring Program Data Report 2006-2013*, http://nmhealth.org/data/view/substance/471/...............5

Office of Diversion Control, Drug Enforcement Administration, Controlled Substances by CSA Schedule (Feb. 8, 2016), http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf.......14

Oklahoma Bureau of Narcotics & Dangerous Drugs Control, *Prescription Monitoring Program (PMP)*, https://www.ok.gov/obndd/Prescription_Monitoring_Program/Administrative_Rules.html.......................................................................................6, 7

Patient Privacy Rights & Zogby International, *2000 Adults' Views on Privacy, Access to Health Information, and Health Information Technology* (2010), http://patientprivacyrights.org/wp-content/uploads/2010/11/Zogby-Result-Illustrations.pdf ...............................................................................22

Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era* (Nov. 12, 2014), http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy_111214.pdf ...............................................................................................13

Physicians' Desk Reference, www.pdr.net.............................................................16

Robert Baker, *Before Bioethics: A History of American Medical Ethics from the Colonial Period to the Bioethics Revolution* (2013).............................. 19, 20

Robert Gehrke, *Feds May Sue Utah Over Law Aimed at Protecting Prescription Drug Records*, Salt Lake Trib., July 2, 2015, http://www.sltrib.com/news/2688175-155/feds-may-sue-utah-over-law?fullpage=1 ....................................................................................10

State of Utah, Office of the Legislative Auditor General, *A Review of the Use of the Controlled Substance Database by Law Enforcement*, Report No. ILR 2015-E (2015), http://le.utah.gov/audit/15_eilr.pdf...............................................9

Warren Vieth, *Narcotic Prescriptions Fall in States with Required 'Doctor-Shopping' Checks*, Oklahoma Watch, May 2, 2014, http://oklahomawatch.org/2014/05/02/drug-overdoses-fall-in-states-with-required-prescription-checks/................................................................................6

**Glossary of Acronyms and Abbreviations**

DEA           Drug Enforcement Administration

HIPAA         Health Insurance Portability and Accountability Act

PDMP          Prescription Drug Monitoring Program

UCSD          Utah Controlled Substance Database

## Statement of *Amici Curiae*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with over 500,000 members dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws. The ACLU of Utah, ACLU of Colorado, ACLU of Kansas, ACLU of New Mexico, ACLU of Oklahoma, and ACLU of Wyoming are state affiliates and chapters of the ACLU. The protection of privacy as guaranteed by the Fourth Amendment is of special concern to *amici*. The ACLU and its state affiliates and chapters have participated in a number of cases involving medical privacy under the Fourth Amendment, including serving as counsel for the plaintiffs-intervenors in *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Administration*, 998 F. Supp. 2d 957 (D. Or. 2014), *appeal pending*, No. 14-35402 (9th Cir.), and as *amici curiae* in support of Appellant Ryan Pyle's suppression motion in his later-dismissed criminal prosecution, *State v. Pyle*, No. 131910379 (3d Dist. Ct., Salt Lake Cty., Utah, July 31, 2014).

*Amici* ACLU affiliates and chapters also have an interest in this case because each state in the Tenth Circuit maintains a prescription drug monitoring program

---

[1] Pursuant to Federal Rule of Appellate procedure 29(c)(5), *amici* state that no party's counsel authored this brief in whole or in part, and that no party or person other than *amici* and their member contributed money toward the preparation or filing of this brief.

database that leaves state residents' sensitive and private prescription records open to warrantless search by state or federal law enforcement. *Amici*'s participation in this case will help inform the Court of the need to make clear that the Fourth Amendment's warrant requirement applies uniformly to these records.

### Authority to File *Amicus Brief*

A motion for leave to file accompanies this brief. *See* Fed. R. App. P. 29(a)–(b).

## Summary of Argument

When Cottonwoods Heights Detective James Woods searched Appellants' prescription records stored in the Utah Controlled Substance Database ("UCSD") without a warrant, he violated their Fourth Amendment rights. That is because Appellants have a reasonable expectation of privacy in their prescription records and the sensitive medical information they reveal. That expectation of privacy finds its source in society's longstanding consensus, dating back to the framing of the Fourth Amendment and before, that medical records deserve the most robust privacy and confidentiality protections. This consensus is reflected in the many state statutes and state and federal judicial decisions that safeguard prescription and other medical records against unjustified search. Indeed, the only federal court in the country to have expressly addressed whether people have a reasonable expectation of privacy in prescription records held in a state prescription drug monitoring program ("PDMP") has held that they do, and that the Fourth Amendment warrant requirement applies. *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.* ("*Oregon PDMP*"), 998 F. Supp. 2d 957, 966–67 (D. Or. 2014), *appeal pending*, No. 14-35402 (9th Cir.).

But this case is about more than just Appellants' Fourth Amendment rights, more even than the Fourth Amendment rights of the other 478 United Fire Authority firefighters, paramedics, and clerical staff whose medical privacy was

violated by Detective Woods and Cottonwoods Heights without any individualized

suspicion, let alone a warrant based on probable cause. This case will determine

whether the sensitive and confidential prescription information stored in secure

state PDMPs in every state in the Tenth Circuit will be protected by the Fourth

Amendment, or instead will remain subject to warrantless incursion at law

enforcement's whim.

To ensure the same level of constitutional protections to all Tenth Circuit

residents, regardless of variations in state laws, and to provide clarity to law

enforcement and the public, this Court should hold that people have a reasonable

expectation of privacy in their prescription records stored in the UCSD and other

state PDMPs.

## Argument

### I.     The Court Should Hold That Appellants' Constitutional Rights Were Violated By Warrantless Access To Their Prescription Records.

This Court should address the central Fourth Amendment question

presented—whether a warrant is required for law enforcement access to

prescription records held in a state prescription drug monitoring program—

regardless of how it resolves the issue of qualified immunity. *See* Appellants'

Opening Br. 14 n.5. Across the Tenth Circuit, the protections against unjustified

searches of confidential PDMP records vary widely depending on state law and on

whether a state or federal law enforcement agent is conducting the investigation.

The protections of the Fourth Amendment should not depend on geographic happenstance or on which uniform the investigators are wearing. Without guidance from this Court, a "person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." *New York v. Belton*, 453 U.S. 454, 460 (1981).

    *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), allows courts discretion to decide which prong of the qualified immunity analysis to address first. In cases like this one, in which law enforcement committed violations of the Fourth Amendment, deciding the constitutional question first ensures that officials who commit similar violations in the future will not perpetually be shielded by qualified immunity should the court also find that the right was not clearly established. *See Saucier v. Katz*, 533 U.S. 194, 207–09 (2001). When courts repeatedly decline to decide the constitutional question, officials are not put on notice of what conduct is unlawful, the advancement of constitutional rights is hindered, and people are left unprotected against violation of their rights. *See Elwell v. Byers*, 699 F.3d 1208, 1213 (10th Cir. 2012) (deciding constitutional question before turning to qualified immunity analysis, and noting that failure to resolve constitutional questions can result in officials repeating the challenged and perhaps unconstitutional practice over and over). Deciding first whether a constitutional right was violated, rather than whether the right was clearly established, "promotes clarity in the legal

standards for official conduct, to the benefit of both the officers and the general public," *Wilson v. Layne*, 526 U.S. 603, 609 (1999), and "promotes the development of constitutional precedent," *Pearson*, 555 U.S. at 236. After *Pearson*, "it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 2032 (2011).

The reasons to decide the constitutional question in this case are strong. Every state in the country but one has created a prescription drug monitoring program.[2] This includes every state in the Tenth Circuit. Like in Utah, in Colorado, Kansas, New Mexico, Oklahoma, and Wyoming pharmacists must electronically report information to a central state-run database about every prescription for a controlled substance that they fill. *See* Colo. Rev. Stat. § 12-42.5-403; Kan. Stat. Ann. § 65-1683; N.M. Code R. § 16.19.29.8; Okla. Stat. tit. 63, § 2-309C; Utah Code Ann. § 58-37f-203; Wyo. Stat. Ann. § 35-7-1060(b). Those databases have been in operation for years, and contain large numbers of prescription records. For example, the New Mexico Prescription Monitoring Program was established in

---

[2] Missouri is the only state that has not created a PDMP. *See* Marshall Griffin, *Battle Over Prescription Drug Monitoring Renewed for 2016 Missouri Legislative Session*, St. Louis Public Radio, Dec. 17, 2015, http://news.stlpublicradio.org/post/battle-over-prescription-drug-monitoring-renewed-2016-missouri-legislative-session.

2005[3] and contained more than 27 million prescription records as of 2014.[4] With

"[m]ore than 3 million prescriptions for controlled substances . . . reported to the

NM PMP each year," the quantity of records will continue to grow rapidly.[5] In

Utah, the UCSD was created in 1995[6] and contained more than 47 million

prescription records as of September 2012.[7] Records of nearly two million

prescriptions were added to the Colorado PDMP in just four months in 2015.[8] In

Oklahoma, pharmacies filled 9.6 million prescriptions for controlled substances in

2013 alone, meaning that the ten-year-old Oklahoma Prescription Monitoring

Program contains many times that number of records in total.[9]

---

[3] New Mexico Dep't of Health, *New Mexico Prescription Monitoring Program Data Report 2006-2013*, at 2, http://nmhealth.org/data/view/substance/471/.

[4] Carl Flansbaum, *New Mexico's Prescription Monitoring Program*, presented at New Mexico Nurse Practitioner Council 2015 Annual Conference (2015), https://c.ymcdn.com/sites/www.nmnpc.org/resource/resmgr/2015_Conference/Flansbaum_-_PMP.pdf. & http://www.nmnpc.org/?page=2015PostConf.

[5] New Mexico Dep't of Health, *supra* note 3, at 3.

[6] *Utah Controlled Substance Database*, Utah Division of Occupational & Professional Licensing, http://dopl.utah.gov/programs/csdb/index.html.

[7] Marvin H. Sims, C.S. DataBase Administrator, *Utah's Controlled Substance Database Program* 4 (Sept. 18–19, 2012), http://www.pdmpassist.org/pdf/PPTs/West2012/3_Sims_NewInitiatives.pdf.

[8] Colorado Dep't of Regulatory Agencies, *Prescription Drug Monitoring Program (PDMP): News*, Utilization Statistics, https://www.colorado.gov/pacific/dora/PDMP_News#UtilizationStats (showing a total of 1,972,126 prescription records added to Colorado PDMP in March, June, September, and December 2015).

[9] Warren Vieth, *Narcotic Prescriptions Fall in States with Required 'Doctor-Shopping' Checks*, Oklahoma Watch, May 2, 2014,

As explained below and in Appellants' brief, the prescription records in these databases are highly sensitive. These records not only detail information about the medications a person takes, but also reveal details of underlying diagnoses and physicians' confidential medical advice. *See infra* Part II.A; Appellants' Opening Br. 15–21. Yet, the rules governing law enforcement access to these troves of private data vary widely from state to state.

In New Mexico, Oklahoma, and Wyoming, law enforcement can request prescription records from those states' PDMPs without any legal process whatsoever. In New Mexico, law enforcement officials can obtain records as long as those officials are "engaged in an ongoing investigation of an individual in the enforcement of the laws governing licit drugs." N.M. Code R. § 16.19.29.9(D)(5). Upon request of law enforcement, the Wyoming State Board of Pharmacy will release records from the Wyoming Online Prescription Database as long as the Board "reasonably suspects [the records] may relate to fraudulent or illegal activity." Wyo. Stat. Ann. § 35-7-1060(c)(ii); Wyo. Rules & Regs., Dep't of Admin. & Info., Bd. of Pharmacy, Ch. 8, § 3(e). In Oklahoma, "peace officers and investigative agents of federal, state, county or municipal law enforcement

---

http://oklahomawatch.org/2014/05/02/drug-overdoses-fall-in-states-with-required-prescription-checks/; Oklahoma Bureau of Narcotics & Dangerous Drugs Control, *Prescription Monitoring Program (PMP)*, https://www.ok.gov/obndd/Prescription_Monitoring_Program/Administrative_Rules.html.

agencies" can access prescription records "in furtherance of criminal, civil or administrative investigations or prosecutions." Okla. Stat. tit. 63, § 2-309D(A)(1)–(2), (B). As was the case in Utah at the time of the searches of Appellants' records, in Oklahoma law enforcement can obtain log-in credentials allowing them to directly "access the system" and download records from it.[10]

In Colorado, law enforcement officials can obtain records if "the request for information is accompanied by an official court order or subpoena." Colo. Rev. Stat. § 12-42.5-404(3)(e). Subpoenas are issued upon a mere relevance standard, *see Charnes v. DiGiacomo*, 612 P.2d 1117, 1122 (Colo. 1980), far short of the probable cause required for a warrant under the Fourth Amendment. *Oregon PDMP*, 998 F. Supp. 2d at 966–67.

In Kansas, law enforcement officials must obtain a search warrant upon a showing of probable cause. Kan. Stat. Ann. § 65-1685(c)(4) (citing *id*. § 22-2502 (governing issuance of search warrants)). Likewise in Utah, where the legislature imposed a statutory warrant requirement for law enforcement access to the UCSD last year. Utah Code Ann. § 58-37f-301(2)(k), *as amended by* 2015 Utah Laws Ch. 326 (S.B. 119).

---

[10] Oklahoma Bureau of Narcotics & Dangerous Drugs Control, *Prescription Monitoring Program (PMP)*, https://www.ok.gov/obndd/Prescription_Monitoring_Program/Administrative_Rules.html

Clarifying that the Fourth Amendment's warrant requirement applies to
PDMP records will have the salutary effect of raising the floor across this Circuit
to the level the Constitution requires, providing residents of Colorado, New
Mexico, Oklahoma, and Wyoming with the same quantum of protection against
unjustified searches as residents of Kansas and Utah now have. The Court should
take this opportunity to so rule, as other cases presenting the question may not soon
be forthcoming. In Utah, over the course of 20 years of operation of the UCSD,
*amici* are aware of only three cases in which the constitutionality of warrantless
UCSD searches was challenged: the suppression motions brought by Appellants in
the context of their later-dismissed state-court prosecutions, and a later-settled suit
against a police officer for his search of UCSD records outside the context of any
legitimate investigation and in violation of the UCSD statute. *State v. Pyle*, No.
131910379 (3d Dist. Ct., Salt Lake Cty., Utah, July 31, 2014; *State v. Jones*, No.
131904471 (3d Dist. Ct., Salt Lake Cty., Utah, Apr. 16, 2014); *Holmes v. State*,
No. 2:12-cv-01098 TS, 2014 WL 2645381 (D. Utah June 13, 2014). This, despite
the fact that law enforcement has searched the UCSD with great frequency—an
average of 238 times per month in the year leading up to enactment of the statutory
warrant requirement[11]—and that 744 officers from 185 law enforcement agencies
were registered to directly access UCSD records as of 2012.[12]

---

[11] State of Utah, Office of the Legislative Auditor General, *A Review of the Use*

This dearth of challenges may be due in part to the fact that people whose UCSD records were searched but who were never criminally charged were not required to receive notice of the search. And for people who are charged, any challenges brought in the context of suppression motions are likely to be disposed of under the good-faith exception to the exclusionary rule, without addressing the underlying Fourth Amendment question. *See United States v. Phillips*, 458 F. App'x 757, 759 (10th Cir. Feb. 1, 2012) (invoking good-faith exception to deny suppression of records obtained from the Oklahoma Prescription Monitoring Program without a warrant); Ruling on Mot. To Suppress, *Pyle*, No. 131910379, slip op. at 6–8 (same, for records from UCSD). Without a ruling from this Court, the denizens of the Tenth Circuit states that lack a statutory warrant requirement will remain unprotected from warrantless searches of their private and sensitive prescription records.

Even in the jurisdictions where a warrant is required by statute, action by this Court is needed. In Kansas and Utah, state and local law enforcement officials are bound by the statutes requiring search warrants, but federal agencies take the position that they are not. The federal Drug Enforcement Administration typically uses administrative subpoenas to request records from state PDMPs. *E.g., Oregon*

---

*of the Controlled Substance Database by Law Enforcement*, at 3, Report No. ILR 2015-E (2015), http://le.utah.gov/audit/15_eilr.pdf.

[12] Sims, *supra* note 7, at 8.

*PDMP*, 998 F. Supp. 2d at 960–61; *U.S. Dep't of Justice v. Colo. Bd. of Pharmacy*, No. 10-cv-01116-WYD-MEH, 2010 WL 3547898, at \*1–2 (D. Colo. Aug. 13, 2010). After Utah enacted its warrant requirement, the DEA continued sending administrative subpoenas to the state, on the theory that a state statute could not constrain a federal agency. Robert Gehrke, *Feds May Sue Utah Over Law Aimed at Protecting Prescription Drug Records*, Salt Lake Trib., July 2, 2015[13]; *see also Colo. Bd. Of Pharmacy*, 2010 WL 3547898, at \*4, *aff'd* 2010 WL 3547896 (Sept. 3, 2010) (holding that state-law limitations on law enforcement access to Colorado's PDMP were preempted by a federal subpoena statute). The DEA engaged in the same conduct in Oregon, despite a state statute requiring a warrant, ceasing only after a federal court issued a permanent injunction barring use of subpoenas to access PDMP records on Fourth Amendment grounds. Judgment, *Oregon PDMP*, No. 3:12-cv-02023-HA, ECF No. 63 (D. Or. Mar. 12, 2014) ("The [DEA's] requests for personally identifiable prescription records from the Oregon Prescription Drug Monitoring Program without first obtaining and producing a warrant violates the Fourth Amendment of the United States Constitution. Accordingly, the [DEA] is hereby permanently enjoined from obtaining

---

[13] http://www.sltrib.com/news/2688175-155/feds-may-sue-utah-over-law?fullpage=1; *see also* Editorial, *Don't Let DEA Bypass Judges and Search Warrants*, Salt Lake Trib., July 4, 2015, http://www.sltrib.com/opinion/2691649-155/editorial-dont-let-dea-bypass-judges.

prescription records from the Oregon [PDMP] without first securing a warrant based upon probable cause."). Addressing the constitutional question in this case will ensure that residents of this Circuit have the same protections whether they are investigated by state or federal officials. The DEA may not feel bound by state laws, but it is unquestionably bound by the requirements of the Fourth Amendment.

However this Court rules on qualified immunity, the important Fourth Amendment question raised here should be addressed first. Should the Court ultimately confer immunity, the avoidance of this question would "frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior." *Camreta*, 131 S. Ct. at 2031 (quoting *Pearson*, 555 U.S. at 237).[14]

## II.     People Have a Reasonable Expectation of Privacy in their Prescription Records and the Confidential Medical Information Those Records Reveal.

Where an individual has a reasonable expectation of privacy in an item or location to be searched, the search is "*per se* unreasonable" under the Fourth Amendment unless conducted pursuant to a judicial warrant. *City of Los Angeles v.*

---

[14] This Court also has reason to decide the constitutional question as it relates to the municipal liability claim. Even if the Court believes remand is necessary to allow amendment of the complaint or further development of the factual basis for municipal liability, judicial economy will be served by ruling on the Fourth Amendment legal question now, thereby avoiding a subsequent appeal raising the identical question.

*Patel*, 135 S. Ct. 2443, 2452 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). Only if there is no reasonable expectation of privacy, or if one of the "few specifically established and well-delineated exceptions" to the warrant requirement applies, may government officials conduct a warrantless search. *Id*.

Under the Fourth Amendment, there is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion). "Instead, 'the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.'" *Id*. (quoting *Oliver v. United States*, 466 U.S. 170, 178 (1984)). Warrantless access to confidential medical records impinges on privacy expectations recognized by societal understandings, case law, states' practices, and longstanding principles of medical ethics known to the Fourth Amendment's framers and relied on by the public today. These sources provide redundant support for the same basic proposition, that society has reached near consensus about the need to maintain the privacy of medical and prescription records. As the Pew Research Center has found, people consider information about the "state of their health and *the medicines they take*" to be among the most private pieces of information about them, with more people deeming it "sensitive" than the contents

12

of their emails or text messages, their relationship history, or their religious views.[15]

For these reasons, in a case raising issues similar to those in this litigation, a court in the District of Oregon has held that the "expectation of privacy in . . . prescription information is objectively reasonable" and that law enforcement's "use of administrative subpoenas [instead of warrants] to obtain prescription records from [a state PDMP] violates the Fourth Amendment." *Oregon PDMP*, 998 F. Supp. 2d at 966–67. This Court should likewise hold that a warrant is required for law enforcement access to such sensitive and private records.

### A. The Utah Controlled Substance Database contains large volumes of sensitive and private medical information.

The Utah Controlled Substance Database is an electronic database maintained by the Utah Division of Occupational and Professional Licensing that records information about "every prescription for a controlled substance dispensed in the state to any individual other than an inpatient in a licensed health care facility." Utah Code Ann. § 58-37f-201(5). After dispensing a controlled substance to a patient in Utah, pharmacists are required to electronically report to the UCSD

---

[15] Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era* 32 (Nov. 12, 2014), http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy_111214.pdf (emphasis added). Eighty-one percent of respondents considered information about health and medications to be "sensitive." Id.

the name, address, date of birth, gender, and ID number of the patient;

identification of the pharmacy and pharmacist dispensing the drug and the

practitioner who prescribed the drug; and the name and Rx number of the drug

prescribed, date the prescription was issued and filled, quantity, strength, and

dosage of the drug, and information about the number of days' supply dispensed

and the number of refills authorized. Utah Code Ann. § 58-37f-203(3); Utah

Admin. Code r. 156-37f-203(1)(a). Reporting of additional information, including

customer identification number and customer location, is "strongly suggested" but

not mandatory. Utah Admin. Code r. 156-37f-203(1)(b).

For purposes of the UCSD, "controlled substances" consist of all drugs

"included in Schedules I, II, III, IV, or V of the federal Controlled Substances

Act,"[16] 21 U.S.C. § 812, and all drugs included in the parallel section of the Utah

Controlled Substances Act, Utah Code Ann. §§ 58-37-4, 58-37-4.2. *See id*. § 58-

37-2(1)(f). Drugs listed as controlled substances and tracked by the UCSD include

a number of frequently prescribed medications used to treat a wide range of serious

medical conditions, including anxiety disorders, panic disorders, post-traumatic

stress disorder, weight loss associated with AIDS, nausea and weight loss in cancer

---

[16] A list of drugs categorized as controlled substances under the federal
Controlled Substances Act is available on the Drug Enforcement Administration
website. Office of Diversion Control, Drug Enforcement Administration,
Controlled Substances by CSA Schedule (Feb. 8, 2016),
http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf.

patients undergoing chemotherapy, alcohol addiction withdrawal symptoms, opiate

addiction, testosterone deficiency, gender identity disorder/gender dysphoria,

chronic and acute pain, seizure disorders, narcolepsy, insomnia, and attention

deficit hyperactivity disorder. These conditions are among the most frequently

diagnosed in Americans—for example, approximately 100 million U.S. adults

suffer from chronic pain,[17] "an estimated 50–70 million US adults have sleep or

wakefulness disorder,"[18] approximately 40 million American adults suffer from

anxiety disorders each year,[19] and more than one million people in the United

States have an HIV infection.[20] This means that the UCSD and similar databases in

other states do now or soon will contain sensitive information about the majority of

Americans. Table 1 lists selected medications tracked by the UCSD that are used

to treat the medical conditions listed above.

---

[17] Institute of Medicine of the National Academies, Committee on Advancing Pain Research, Care, and Education, *Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research 2* (2011), http://books.nap.edu/openbook.php?record_id=13172.

[18] *Insufficient Sleep is a Public Health Epidemic*, Centers for Disease Control & Prevention (Sept. 3, 2015), http://www.cdc.gov/features/dssleep/.

[19] Nat'l Institute of Mental Health, Nat'l Institutes of Health, *Anxiety Disorders* 1 (2009), https://www.nsu.edu/Assets/websites/counseling-center/resources/Anxiety-Disorders-Fact-Sheet.pdf.

[20] *HIV in the United States: At A Glance*, Centers for Disease Control & Prevention (Sept. 29, 2015), http://www.cdc.gov/hiv/statistics/basics/ataglance.html.

| TABLE 1[21]<br><br>Medical Condition | Medications Approved for Treatment of Condition |
|---|---|
| Hormone replacement therapy for treatment of gender identity disorder/gender dysphoria | Testosterone |
| Weight loss associated with AIDS | Marinol (dronabinol), Cesamet (nabilone |
| Nausea & vomiting in cancer patients undergoing chemotherapy | Marinol (dronabinol), Cesamet (nabilone) |
| Trauma- and stressor-related disorders, including acute stress disorder and post-traumatic stress disorder (PTSD) | Xanax, Valium, Ativan, Lexotan, Librium, Traxene, Sepazon, Serax, Centrax, nordiazepam |
| Anxiety disorders and other disorders with symptoms of panic | Xanax, Valium, Ativan, Lexotan, Librium, Traxene, Sepazon, Serax, Centrax, nordiazepam |
| Alcohol addiction withdrawal symptoms | Serax/Serenid-D, Librium (chlordiazepoxide) |
| Opiate addiction treatment | Buprenorphine (Suboxone), methadone |
| Attention deficit hyperactivity disorder | Ritalin, Adderol, Vyvanse |
| Obesity (weight loss drugs) | Didrex, Voranil, Tenuate, mazindol |
| Chronic or acute pain | Narcotic painkillers, such as codeine (including Tylenol with codeine), hydrocodone, Demerol, morphine, Vicodin, oxycodone (including Oxycontin and Percocet) |
| Epilepsy and seizure disorders | Nembutal (pentobarbital), Seconal (secobarbital), clobazam, clonazepam, Versed, Fycompa (perampanel) |
| Testosterone deficiency in men | Maxibolin, Orabolin, Durabolin, Duraboral (ethylestrenol) |
| Delayed puberty in boys | Anadroid-F, Halotestin, Ora-Testryl |
| Narcolepsy | Xyrem, Provigil |
| Insomnia | Ambien, Lunesta, Sonata, Restoril, |

---

[21] Descriptions of listed medications, including their approved uses, are available through the Physicians' Desk Reference website, www.pdr.net.

| | Halcion, Doral, Ativan, ProSom, Versed, Belsomra |
|---|---|
| Migraines | Butorphanol (Stadol) |

Information about an individual's prescriptions in the UCSD can reveal a great deal of private medical information beyond just the medication prescribed. Because many of these drugs are approved only for treatment of specific diseases or disorders, "[i]nformation contained in prescription records . . . may reveal other facts about what illnesses a person has." *Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005); *accord Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133, 1138 (3d Cir. 1995) ("It is now possible from looking at an individual's prescription records to determine that person's illnesses, or even to ascertain such private facts as whether a woman is attempting to conceive a child through the use of fertility drugs."). A patient's prescription history can reveal her physician's confidential medical advice, her chosen course of treatment, her diagnosis, and even the stage or severity of her disorder or disease.

In recognition of the sensitivity of these records, the Utah Legislature made it a felony to obtain or release information from the database without authorization. Utah Code Ann. § 58-37f-601. Physicians and pharmacists are permitted to access records in the database only for enumerated purposes, including providing diagnosis and treatment to a current or prospective patient or assessing whether that patient may have inappropriately obtained prescriptions in the past, and

checking on prescriptions issued under the physician's own DEA number. *Id*. § 58-37f-301(2)(f). And as of last year, law enforcement is prohibited from accessing records in the database unless "pursuant to a valid search warrant." *Id*. § 58-37f-301(2)(k).

**B.**    **The confidentiality of patient health information is protected by longstanding ethical rules that were known to the framers of the Fourth Amendment and continue in force today.**

Society's recognition that an expectation of privacy in prescription records is reasonable finds its source, in part, in the fact that "[m]edical records, of which prescription records form a not insignificant part, have long been treated with confidentiality." *Oregon PDMP*, 998 F. Supp. 2d at 964.

The Oath of Hippocrates, originating in the fourth century B.C.E., required physicians to maintain patient secrets. Bernard Friedland, *Physician-Patient Confidentiality*, 15 J. Legal Med. 249, 256 (1994). In American medical practice, a requirement to preserve the confidentiality of patient health information was included in the earliest codes of ethics of American medical societies in the 1820s and 1830s, the first Code of Medical Ethics of the American Medical Association in 1847, every subsequent edition of that code, and in the ethical codes of other health professionals, including the American Nurses Association and American Pharmaceutical Association. *See* Declaration of Professor Robert Baker in Support of Plaintiffs-Intervenors' Motion for Summary Judgment, at ¶¶ 12–15 *Oregon*

18

*PDMP*, No. 3:12-cv-02023-HA (dated June 28, 2013), attached as Amici's Appendix. Today, virtually all patients (97.2%) believe that health care providers have a "legal and ethical responsibility to protect patients' medical records."[22]

Medical confidentiality was an established norm in colonial and founding-era America, and the framers of the Fourth Amendment were well aware of the need for maintaining the confidentiality of patients' medical information. In the eighteenth century, almost every American "regular physician" studied at the University of Edinburgh Medical School in Scotland or under someone who had trained there. Baker Decl. ¶¶ 4–5; Robert Baker, *Before Bioethics: A History of American Medical Ethics from the Colonial Period to the Bioethics Revolution* 39 (2013). Beginning in the 1730s, every physician who received a medical degree from the University of Edinburgh was required to sign an oath swearing "never, without great cause, to divulge anything that ought to be concealed, which may be heard or seen during professional attendance." Baker Decl. ¶ 6 & n.1; Baker, *Before Bioethics*, at 37. Physicians who had been educated at the University of Edinburgh or under one of its graduates, and thus who had sworn to keep patients' medical information confidential, were among the signers of the Declaration of

---

[22] New London Consulting & FairWarning, *How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes* 10 (Sept. 13, 2011), http://www.fairwarning.com/whitepapers/2011-09-WP-US-PATIENT-SURVEY.pdf.

Independence and delegates to the Constitutional Convention. Baker Decl. ¶ 7. Most notably, Benjamin Rush, one of the signers of the Declaration of Independence, was a physician and an alumnus of the University of Edinburgh, the author of a published lecture on medical confidentiality, and perhaps the most influential medical educator in founding-era America. *Id*. ¶¶ 8–9. Three other physicians were among the signers of the Declaration of Independence, and at least three physicians were delegates to the Constitutional Convention. *Id*. ¶¶ 7, 10. Of the latter, one (James McClurg) received his medical degree from the University of Edinburgh and another (James McHenry) studied under Dr. Rush. *Id*. ¶ 10. "These men would have been well acquainted with the traditional ethical precept of keeping patients' medical information confidential." *Id*.

Further, patients treated by "regular physicians" trained in the Edinburgh tradition would also have understood the guarantee of confidentiality of the medical information they shared with their physicians, including the prescribing orders written to obtain medicine from an apothecary or compounding pharmacist. *Id*. ¶ 18. Like George Washington, who was treated by Edinburgh-educated physician Samuel Bard, most of the delegates to the Constitutional Convention and members of the First Congress would have had access to the services of such physicians, who practiced in significant numbers in the population centers of the late-18th century United States. *Id*. ¶ 5. The delegates and lawmakers thus would

20

have expected their own medical information to have been protected against release to third parties without their consent. *Id*. ¶¶ 5, 18. Ethical protections of the confidentiality of medical information were firmly in place at the time of the Fourth Amendment's ratification in 1791 and were known to the Constitution's framers.

The strong and enduring guarantees of the confidentiality of patients' medical information are "essential to the effective functioning of the health and public health systems. Patients are less likely to divulge sensitive information to health professionals if they are not assured that their confidences will be respected. The consequence of incomplete information is that patients may not receive adequate diagnosis and treatment of important health conditions." Lawrence O. Gostin, *Health Information Privacy*, 80 Cornell L. Rev. 451, 490–91 (1995). "Furthermore, a breach of privacy can result in economic harms such as loss of employment, insurance, or housing. It can also result in social or psychological harms. Disclosure of some conditions can be stigmatizing." *Id*. at 490.

The consequences of law enforcement gaining easy access to medical records are particularly harmful. As one court has explained, "[p]ermitting the State unlimited access to medical records for the purposes of prosecuting the patient would have the highly oppressive effect of chilling the decision of any and all [persons] to seek medical treatment." *King v. State*, 535 S.E.2d 492, 496 (Ga.

2000). The Supreme Court has echoed this concern, recognizing that violating a patient's expectation in the confidentiality of medical information "may have adverse consequences because it may deter patients from receiving needed medical care." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 n.14 (2001) (citing *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977)); *accord Whalen*, 429 U.S. at 602 ("Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention."). This concern is longstanding: the first American medical society to formalize its code of medical ethics, the Medical Society of the State of New York, instructed physicians as early as 1823 that they were not to break patient confidences even when haled into court. Baker Decl. ¶¶ 12–13. Unsurprisingly, 93% of patients want to decide which government agencies can access their electronic health records,[23] and 88% oppose letting police see their medical records without permission.[24]

---

[23] Patient Privacy Rights & Zogby International, *2000 Adults' Views on Privacy, Access to Health Information, and Health Information Technology* 4 (2010), http://patientprivacyrights.org/wp-content/uploads/2010/11/Zogby-Result-Illustrations.pdf.

[24] Institute for Health Freedom & Gallup Organization, *Public Attitudes Toward Medical Privacy* 9–10 (Sept. 26, 2000), http://www.forhealthfreedom.org/Gallupsurvey/IHF-Gallup.pdf.

**C.     State laws protect the privacy of patient medical information, including by requiring probable cause for law enforcement access to prescription records.**

"In evaluating the reasonableness of police procedures under the Fourth Amendment," the Supreme Court has often "looked to prevailing rules in individual jurisdictions" and the trend in relevant state laws. *Tennessee v. Garner*, 471 U.S. 1, 15–16, 18 & n.21 (1985) (citing *United States v. Watson*, 423 U.S. 411, 421–22 (1976)); *see also Elkins v. United States*, 364 U.S. 206, 219 (1960).[25] Here, the majority of states protect the confidentiality of medical information, and a significant number of states specifically require a warrant or probable cause to access records in a state prescription drug monitoring program.

Including Utah, at least eleven states have enacted legislation prohibiting law enforcement from accessing records in those states' prescription drug monitoring programs unless the government gets a warrant or otherwise demonstrates probable cause.[26] Ala. Code § 20-2-214(7); Alaska Stat. §

---

[25] Fourth Amendment rules are not determined by state law, *Virginia v. Moore*, 553 U.S. 164 (2008), but *Garner* illustrates how the Court's assessment of Fourth Amendment standards can be informed by relevant state practices.

[26] Notably, Utah's legislature added the warrant requirement to its PDMP law largely in response to the facts of Appellants' cases, illustrating the legislature's concern for providing stronger privacy protections for the sensitive information in the UCSD. *See* Dennis Romboy, *Unwarranted Drug Database Search Prompts New Utah Law*, *Lawsuits*, Deseret News, Apr. 23, 2015, http://www.deseretnews.com/article/865627152/Unwarranted-drug-database-search-prompts-new-Utah-law-lawsuits.html?pg=all ("[B]ased largely on what

17.30.200(d)(5); Ga. Code Ann. § 16-13-60(c)(3); Iowa Code § 124.553(1)(c);
Kan. Stat. Ann. § 65-1685 (c)(4); Minn. Stat. § 152.126(6)(b)(8); Mont. Code Ann.
§§ 37-7-1506(1)(e), 46-4-301(3); N.H. Rev. Stat. Ann. § 318-B:35(I)(b)(3); Or.
Rev. Stat. § 431A.865 (2)(a)(D); R.I. Gen. Laws § 21-28-3.32(a)(4); Utah Code
Ann. § 58-37f-301(2)(k).[27] In addition, Vermont bars access to prescription records
in its prescription drug monitoring program by law enforcement directly or on
request. Vt. Stat. Ann. tit. 18, § 4284. Maine and Nebraska's prescription drug
monitoring program statutes make no provision for law enforcement access. Me.
Rev. Stat. Ann. tit. 22, § 7250(4); Neb. Rev. Stat. § 71-2455.

Additionally, a number of state courts have held that individuals have a
reasonable expectation of privacy in medical records under state constitutional
provisions or the Fourth Amendment. *See, e.g.*, *State v. Skinner*, 10 So. 3d 1212,
1218 (La. 2009) ("[A]bsent the narrowly drawn exceptions permitting warrantless
searches, we hold a warrant is required to conduct an investigatory search of
medical and/or prescription records."); *King v. State*, 535 S.E.2d 492, 495 (Ga.
2000) ("[A] patient's medical information, as reflected in the records maintained
by his or her medical providers, is certainly a matter which a reasonable person

---

happened to Marlon Jones, state lawmakers earlier this year passed a bill that
makes it more difficult for law enforcement to rifle through Utahns' electronic
medicine cabinets.").

[27] Arkansas requires a warrant for some law enforcement officers but not others.
Ark. Code Ann. § 20-7-606(b)(2)(A), (D).

would consider to be private."); *State v. Nelson*, 941 P.2d 441, 449 (Mont. 1997)

(imposing probable cause requirement); *Commonwealth v. Riedel*, 651 A.2d 135,

139 (Pa. 1994) ("[A]ppellant does have a reasonable expectation of privacy in his

medical records."); *State v. Copeland*, 680 S.W.2d 327, 330 (Mo. Ct. App. 1984)

("Following the law and common practice, it is normally expected that a patient's

disclosures to a hospital will be kept confidential.").

    Further, most states recognize a physician-patient privilege as a matter of

state law. No physician-patient privilege existed at common law, but at least 43

states and the District of Columbia have created one through legislation.[28] These

privileges, like the other state privacy protections discussed above, function to

assure patients of the confidentiality of their medical information and form part of

---

[28] Alaska R. Evid. 504; Ariz. Rev. Stat. Ann. § 12-2235; Ark. R. Evid. 503; Cal. Evid. Code §§ 990–1007; Colo. Rev. Stat. § 13-90-107(d); Conn. Gen. Stat. Ann. § 52-146o; Del. Unif. R. Evid. 503; D.C. Code Ann. § 14-307; Fla. Stat. Ann. § 456.057; Ga. Code Ann. § 24-12-1; Haw. Rev. Stat. § 626-1, Rule 504; Idaho Code Ann. § 9-203.4; 735 Ill. Comp. Stat. Ann. 5/8-802; Ind. Code Ann. § 34-46-3-1; Iowa Code Ann. § 622.10; Kan. Stat. Ann. § 60-427; La. Code Evid. Ann. art. 510; Me. R. Evid. 503; Mich. Comp. Laws Ann. § 600.2157; Minn. Stat. § 595.02; Miss. Code Ann. § 13-1-21; Mo. Ann. Stat. § 491.060; Mont. Code Ann. § 26-1-805; Neb. Rev. Stat. § 27-504; Nev. Rev. Stat. Ann. §§ 49.215–49.245; N.H. Rev. Stat. Ann. § 329:26; N.J. Stat. Ann. § 2A:84A-22.2; N.M. R. Evid. 11-504; N.Y. C.P.L.R. 4504; N.C. Gen. Stat. Ann. § 8-53; N.D. R. Evid. 503; Ohio Rev. Code Ann. § 2317.02 (B); Okla. Stat. Ann. tit. 12, § 2503; Or. Rev. Stat. § 40.235; 42 Pa. Cons. Stat. § 5929; 5 R.I. Gen. Laws § 5-37.3-4; S.D. Codified Laws § 19-13-6; Tex. R. Evid. 509; Utah Code Ann. § 78B-1-137; Vt. Stat. Ann. tit. 12, § 1612; Va. Code Ann. § 8.01-399; Wash. Rev. Code Ann. § 5.60.060; Wis. Stat. Ann. § 905.04; Wyo. Stat. Ann. § 1-12-101.

the basis upon which patients' expectations of privacy are formed. *Cf. United States v. Miller*, 425 U.S. 435, 443 n.4 (1976) (allowing warrantless access to certain banking records under the third-party doctrine, but reserving judgment as to whether the doctrine applies to records covered by "evidentiary privileges, such as that protecting communications between an attorney and his client"); *DeMassa v. Nunez*, 770 F.2d 1505, 1506 (9th Cir. 1985) (per curiam) (discussing attorney-client privilege as a source of clients' reasonable expectation of privacy in their client files held by an attorney).[29]

### D.   A state's limited ability to access records in a PDMP does not eliminate patients' reasonable expectation of privacy in those records.

As Appellants explain, the mere fact that the records at issue were stored by the state in a secure electronic database does not vitiate Appellants' reasonable expectation of privacy in those records. Appellants' Opening Br. 27–33. The sensitive, voluminous, digitized medical information at issue here is not governed

---

[29] Federal law also recognizes the heightened privacy interest in medical records. *See* Privacy Protection Act, 42 U.S.C. § 2000aa-11(a)(3) (the Attorney General must recognize "special concern for privacy interests in cases in which a search or seizure for such documents would intrude upon a known confidential relationship such as that which may exist between . . . doctor and patient"); HIPAA Privacy Rule, 45 C.F.R. § 164.512 (setting rules to protect confidentiality of protected health information). Although the HIPAA Privacy Rule contemplates law enforcement requests for covered records using an administrative subpoena, disclosure is merely permissive, 45 C.F.R. § 164.512(f)(1)(ii)(C), and the Privacy Rule includes a recognition that more protective state standards should not be overridden by the provisions of the federal Rule. *Id.* §§ 160.202, 160.203(b).

by 1970s cases involving limited analog records voluntarily shared with a third

party. The District of Oregon succinctly laid out why:

> [T]his case is markedly different from *Miller*[, 425 U.S. 435] and
> *Smith*[ v. *Maryland*, 442 U.S. 735 (1979),] for two reasons. The first is
> that the PDMP's records are "more inherently personal or private than
> bank records," and are entitled to and treated with a heightened
> expectation of privacy. [*United States v.*] *Golden Valley Elec. Ass'n*,
> 689 F.3d [1108,] 1116 [(9th Cir. 2012)]. *See, DeMassa v. Nunez,* 770
> F.2d 1505 (9th Cir. 1985) (attorney's clients have reasonable
> expectation of privacy in their legal files even though kept and
> maintained by attorney). Secondly, patients and doctors are not
> voluntarily conveying information to the PDMP. The submission of
> prescription information to the PDMP is required by law. The only
> way to avoid submission of prescription information to the PDMP is
> to forgo medical treatment or to leave the state. This is not a
> meaningful choice. *See, In re Application of U.S. for an Order*
> *Directing a Provider of Electronic Communication Service to*
> *Disclose Records to Government,* 620 F.3d 304, 317 (3rd Cir. 2010)
> (holding that cell phone users retain a reasonable expectation of
> privacy in their location information because users have not
> voluntarily shared their information with the cellular provider in any
> meaningful way).

*Oregon PDMP*, 998 F. Supp. 2d at 967.

Indeed, the third-party doctrine is not an on-off switch for privacy

protections. In a variety of contexts under the Fourth Amendment, including

medical records, third-party access to a protected area or information for one

limited purpose does not render that area or information suddenly unprotected from

warrantless government searches. *See, e.g.*, *Ferguson*, 532 U.S. at 77 (reasonable

expectation of privacy in diagnostic test results held by a hospital); *Tucson*

*Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004) ("[A]ll provision of

medical services in private physicians' offices carries with it a high expectation of privacy for both physician and patient."); *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) ("[A] patient's expectation of privacy . . . in his treatment records and files maintained by a substance abuse treatment center is one that society is willing to recognize as objectively reasonable."); *F.E.R. v. Valdez*, 58 F.3d 1530, 1535 (10th Cir. 1995) (noting that the patient-plaintiffs "had an expectation of privacy in their medical records" and upholding search pursuant to a facially valid warrant); *see also, e.g., Florida v. Jardines*, 133 S. Ct. 1409, 1418–19 (2013) (Kagan, J., concurring) (odors detectable by a police dog that emanate from a home); *Kyllo v. United States*, 533 U.S. 27 (2001) (thermal signatures emanating from a home); *United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (contents of packages entrusted to a shipping company); *Katz v. United States*, 389 U.S. 347 (1967) (contents of phone call transmitted via phone company's facilities); *Stoner v. California*, 376 U.S. 483, 487–90 (1964) (implicit consent to janitorial personnel to enter motel room does not amount to consent for police to search room); *Chapman v. United States*, 365 U.S. 610, 616–17 (1961) (search of a house invaded tenant's Fourth Amendment rights even though landlord had authority to enter house for some purposes); *United States v. Warshak*, 631 F.3d 266, 285 (6th Cir. 2010) (email stored on a service provider's servers).

Searching massive computerized databases raises particular concerns. *See United States v. Comprehensive Drug Testing, Inc*., 621 F.3d 1162, 1175–77 (9th Cir. 2010) (en banc); *United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999). Prior to creation of the PDMP, individuals could rely on the practical realities of law enforcement's limited resources to protect them from sweeping, dragnet searches: to obtain records of all of a person's prescriptions, in many cases law enforcement would have had to canvass numerous pharmacies or physicians seeking relevant records, a resource-intensive exercise that would have been justified only in important or well-founded cases. Now, however, the government can obtain an entire transcript of a person's out-patient prescription history for controlled substances with a single query of a PDMP. This case, in which a detective was able to search *480 people's* records as part of his investigation, shows the ease with which law enforcement can now conduct dragnet searches of these databases. This enhanced ability of the government to quickly and easily delve into deeply personal records raises especially serious questions under the Fourth Amendment. *Cf. United States v. Jones*, 132 S. Ct. 945, 963–64 (2012) (Alito, J., concurring in judgment) ("In the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. . . . Only an investigation of unusual importance could have justified such an expenditure of law enforcement resources. Devices like the one used in the present

case, however, make long-term monitoring relatively easy and cheap."). Thus, for

these reasons and as explained in Appellants' brief, the third-party doctrine does

not preclude relief under the Fourth Amendment here.

**Conclusion**

For the foregoing reasons, *amici* respectfully urge this Court to hold that

people have a reasonable expectation of privacy in their prescription records held

in a state prescription drug monitoring program, and that a search of those records

by law enforcement requires a warrant based on probable cause.


March 30, 2016                              Respectfully submitted,

                                            /s/ Leah Farrell
                                           _____
                                           Leah Farrell (USB No. 13696)
                                           John Mejia (USB No. 13965)
                                           ACLU of Utah Foundation, Inc.
                                           355 North 300 West
                                           Salt Lake City, Utah 84103
                                           Phone: (801) 521-9863
                                           Fax: (801) 532-2850
                                           lfarrell@acluutah.org
                                           jmejia@acluutah.org

                                           Nathan Freed Wessler
                                           American Civil Liberties Union
                                              Foundation
                                           125 Broad Street, 18th Floor
                                           New York, New York 10004
                                           Phone: (212) 549-2500
                                           Fax: (212) 549-2654
                                           nwessler@aclu.org

Mark Silverstein
Sara R. Neel
American Civil Liberties Union
    Foundation of Colorado
303 E. 17th Avenue, Suite 350
Denver, Colorado 80203
Phone: (720) 402-3114
msilverstein@aclu-co.org
sneel@aclu-co.org

Stephen Douglas Bonney
ACLU Foundation of Kansas
6701 W. 64th Street, Suite 210
Overland Park, Kansas 66202
Phone: (913) 490-4102
dbonney@aclukansas.org

Alexandra Freedman Smith
ACLU of New Mexico Foundation
P.O. Box 566
Albuquerque, New Mexico 87103-0566
Phone: (505) 266-5915 Ext. 1008
Fax: (505) 266-5916
asmith@aclu-nm.org

Brady R. Henderson, OBA#21212
ACLU of Oklahoma Foundation
3000 Paseo Drive
Oklahoma City, Oklahoma 73103
Phone: (405) 525-3831
Fax: (405) 524-2296
bhenderson@acluok.org

Courtney A. Bowie*
American Civil Liberties Union of
    Wyoming
P.O. Box 20706
Cheyenne, Wyoming 82001
Phone: 307-637-4565
Fax: 605-332-5648

cbowie@aclu.org

*admitted in Alabama, Mississippi and
Massachusetts (inactive)*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P.

    32(a)(7)(B) and Fed. R. App. P. 29(d) because:

      This brief contains 6,965 words, excluding the parts of the brief exempted

      by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-counting

      feature of Microsoft Office 2010.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

    and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      This brief has been prepared in a proportionally-spaced typeface using

      Microsoft Word in 14-point Times New Roman.

                                             */s/ Leah Farrell*
                                             Leah Farrell

**APPENDIX**

Declaration of Professor Robert Baker in Support of Plaintiffs-Intervenors' Motion for Summary Judgment, *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.*, 998 F. Supp. 2d 957 (D. Or. 2014), No. 3:12-cv-02023-HA (dated June 28, 2013).

Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
PO Box 40585
Portland, OR 97240
Tel.: (503) 227-6928; Fax: (503) 227-6948

Nathan Freed Wessler *(pro hac vice)*
Email: nwessler@aclu.org
Ben Wizner *(pro hac vice)*
Email: bwizner@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500; Fax: (212) 549-2654

Attorneys for the Plaintiffs-Intervenors

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **OREGON PRESCRIPTION DRUG MONITORING PROGRAM**, an agency of the **STATE OF OREGON**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE**,<br><br>Defendant. | Case No.: 3:12-cv-02023-HA<br><br>**DECLARATION OF PROFESSOR ROBERT BAKER IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR SUMMARY JUDGMENT** |

JOHN DOE 1, et al.,

      Plaintiffs-Intervenors,

            v.

UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION,
an agency of the UNITED STATES
DEPARTMENT OF JUSTICE,

      Defendant in Intervention.

I, Dr. Robert Baker, hereby declare and state as follows:

1.    I am a Professor of Bioethics and the William D. Williams Professor of Philosophy at Union College and Director of the Union Graduate College-Icahn Mount Sinai School of Medicine Bioethics Program. I have been on the Union College faculty since 1973, where I teach courses on the history of medical ethics among other topics. I received a BA with Honors in History from the City College of New York and a PhD in Philosophy from the University of Minnesota. I have served as an American Philosophical Society fellow, an Institute for Health and Human Values fellow, an NYU Faculty Resources Network Scholar in Residence, a visiting scholar at the former Wellcome Institute for the History of Medicine in London, a senior scholar-in-residence at the American Medical Association Institute on ethics, and a College of Physicians of Philadelphia Wood Institute Fellow. I am a member of the American Philosophical Association, the American Association of Historians of Medicine, the International Association of Bioethics, and the American Society for Bioethics and Humanities, where I was founding chair, and currently co-chair, the Affinity Group on the History of Medical Ethics.

2 - DECLARATION OF PROF. ROBERT BAKER

2.      Much of my research has focused on the history of medical ethics. I have authored, coauthored, edited, and coedited several publications on this topic, including *The Cambridge World History of Medical Ethics* (coeditor); "Medical Ethics and Epidemics: A Historical Perspective" in *Ethics and Epidemics* (author and coeditor); and *The Codification of Medical Morality: Historical and Philosophical Studies of the Formalization Of Medical Morality in the Eighteenth and Nineteenth Centuries*, Volumes I and II (coeditor). I am currently in the final stages of authoring a book entitled *Before Bioethics: A History of American Medical Ethics from the Colonial Period to the Bioethics Revolution*. Two of my books on the history of medical ethics have been awarded a citation by *Choice*, the journal of archives and academic libraries, as an "outstanding" academic in its field. BioMedLib, a medical library reference service, cites one of my articles as the most cited in the history of medical ethics. I wrote the sections on the history of medical ethics and codes of medical ethics for several standard reference works in applied ethics, bioethics and the history of medicine, including the *Encyclopedia of the History of Medicine*, the *Encyclopedia of Applied Ethics* (2nd ed.), the forthcoming *Springer Compendium & Atlas of Global Bioethics*, and the *Encyclopedia of Bioethics* (4th ed.) To support my research I have been awarded a total of four National Endowment of the Humanities grants, three for my work in the history of medicine and medical ethics. A complete copy of my curriculum vitae is attached to this declaration.

3.      I have been asked to offer my expertise regarding standards and practices of medical confidentiality in colonial and founding-era America.

4.      Until 1765, there was no formal medical education in America and almost all "regularly educated" eighteenth century American physicians (to use the terminology of the period)

3 - DECLARATION OF PROF. ROBERT BAKER

studied at the University of Edinburgh Medical School in Scotland or under someone who had trained there. A "regular physician," is someone who received a Bachelors of Science degree or a Medical Doctorate from a university that has a curriculum similar to what one would expect a medical school to teach even today: anatomy, biology, chemistry, *materia medica*, physiology, and the theory of practice of physic (internal medicine) and surgery, supplemented by dissections, laboratory work, and clinical teaching at the bedside in hospitals.

5.    The earliest American medical schools, such as those associated with Columbia University College of Physicians and Surgeons (founded 1767) and the University of Pennsylvania School of Medicine (founded 1765) were modeled after the University of Edinburgh Medical School and were started by physicians like Samuel Bard (1742-1821). Bard was George Washington's physician during the period when New York City was the nation's capital and routinely lectured his medical students at Columbia about medical ethics.  We do not have an accurate census of the number of regularly educated physicians who studied medicine at Edinburgh or under someone educated there; however, by the end of the 18th century, virtually every physician with a medical degree in Philadelphia had either studied in Edinburgh or under someone who had studied there. Much the same was true in New York City. Turning southward: about 230 Virginia physicians studied at Edinburgh between 1765 and 1800, approximately half receiving formal degrees (the others typically studied between one and four years without receiving a degree). Although the number of irregularly trained medical practitioners exceeded these "regulars," even in New York, Pennsylvania and Virginia, it was the degree-

4 - DECLARATION OF PROF. ROBERT BAKER

holding Edinburgh-style "regularly educated" physicians, the "regulars," as they referred to themselves, who created mainstream American medical ethics.

6.   Beginning in the 1730s, Bard and every other medical student matriculated at the University of Edinburgh was required to sign or affirm an oath swearing to "practice physic [i.e. medicine] cautiously, chastely and honourably," and "never, without great cause, to divulge anything that ought to be concealed, which may be heard or seen during professional attendance."[1] Keeping patients' medical information confidential was a central ethical requirement of physicians at the time. That tradition finds its roots in the Hippocratic Oath, written during the fourth or fifth century BCE, which included a requirement that the physician keep whatever is seen or heard in medical practice as "holy secrets."

7.   Physicians who had been educated at the University of Edinburgh, or by one of its alumni, were among the signers of the Declaration of Independence and delegates to the Constitutional Convention. Several physicians who signed the Declaration of Independence included Josiah Bartlett, Matthew Thornton, and Lyman Hall—and Benjamin Rush. Rush, who tended to George Washington's troops at Valley Forge, was

---

[1] The full Edinburgh University Medical Oath, circa 1732-35 onwards, reads:

Tum porro artem medicam caute, caste, probeque excercitaturum, et quoad portero omnia ad aegrotorum corporum salutem conducentia cum fide procuraturum quae denique inter medendum visa vel audita silere convenit non sine gravi causa vulgaturum.  Ita presens spondenti adsit numen.

*[I A. B. do solemnly declare that I will] practice physic cautiously, chastely, and honourably; and faithfully to procure all things conducive to the health of the bodies of the sick*; and lastly, never, without great cause, to divulge anything that ought to be concealed, which may be heard or seen during professional attendance.  To this oath let the Deity be my witness.

5 - DECLARATION OF PROF. ROBERT BAKER

an also alumnus of the University of Edinburgh and like Bard affirmed the Edinburgh Oath on matriculation.[2]

8.    Rush was also a professor at the medical college associated with what is today the University of Pennsylvania and he regularly lectured his students on medical ethics. A collection of these lectures was published in 1811, and one of these, delivered as part of a course offered in 1801, "On the Duties of Patients to their Physicians," addressed the physician-patient covenant. In this lecture Rush informed his students that patients were duty bound to confide in their physicians. "Let not a patient be afraid of making a physicians his friend," by confiding in him, Rush explained to his students, for "in doing so they impose an obligation of secrecy upon him, and thus prevent his making public what he cannot avoid seeing or hearing."[3]

9.    Bard and Rush were the first two American physicians to publish on medical ethics. They were extraordinarily influential on physicians throughout colonial and post-colonial America. As one commentator wrote, between 1779 and 1812 Rush is credited with "exerting more influence on the medical profession that any other person during the quarter century following the [Revolutionary] War for Independence. His students practiced throughout the country from Massachusetts to Georgia," i.e., from the northernmost and southernmost states in the union.[4]

---

[2] Affirmation was an alternative to signing for Quakers and others who believed that Christians could not sign oaths.
[3] Rush, Benjamin [1801] 1811. "On the Duties of Patients to Their Physicians," in *Sixteen Introductory Lectures upon the Institutes and Practice of Medicine, With a Syllabus of the Latter... Delivered in the University of Pennsylvania.* Cite at http://archive.org/stream/2569048R.nlm.nih.gov/2569048R#page/n333/mode/2up/search/322.
[4] Brodsky, Alyn. 2004. *Benjamin Rush: Patriot and Physician.* New York: St. Martin's Press, 278.

6 - DECLARATION OF PROF. ROBERT BAKER

10. Three physicians are known to have attended the Constitutional Convention of 1787—James McClurg of Virginia (1746-1823), James McHenry of Maryland, (1753-1816) and Hugh Williamson of North Carolina (1735-1819). McHenry received his medical education studying under Dr. Rush, and McClurg received his medical degree at the University of Edinburgh and would have signed or affirmed the Edinburgh oath. These men would have been well acquainted with the traditional ethical precept of keeping patients' medical information confidential.

11. In the eighteenth century, physicians would write prescription orders for their patients to fill at apothecaries. Although I am not aware of any specific historical record regarding the confidentiality of such prescriptions, I presume based on my general knowledge of medical ethical principles at the time that the same expectations of medical privacy discussed above applied in this context.

12. The first medical societies came into existence during the colonial period but did not begin to formalize their understanding of medical ethics into formal codes until the early nineteenth century. The earliest formal code of medical ethics was issued in 1823 by the Medical Society of the State of New York (MSSNY)—which traces back to a Society of Weekly Practitioners founded during the colonial period by Samuel Bard and his father, John Bard (1716-1789). A special section of that code dealt with confidentiality with respect to physicians' testimony in courts of law.

13. The following is the section on *Forensic Medical Police* from the first American Code of Medical Ethics published by an American medical Society. This code was published in 1823 by the Medical Society of the State of New York.

> XXII. There are numerous accidents and offences, the nature and degree of criminality of which are determined by medical opinion. ...A physician should

7 - DECLARATION OF PROF. ROBERT BAKER

always be in readiness to answer in these jurisdictional inquisition, and to give an opinion, on facts referred to his judgment, according to the approved doctrines of medicine and surgery, as far as these are ascertained....

XXIII. To well instructed physicians only two rules need to be recommended. The one relating to their conduct when they are called upon to give professional evidence; and the other, to the nature and extent of the secrecy which they are bound to maintain in relation to their patients.

1st. When physicians engaged in the decision of a forensic question are unbiased by the parties, and have no interest for plaintiff or defendant, (being well-informed of all the facts alleged in evidence) they have only to decide by known medical principles, and can therefore rarely disagree. It is their duty to obtain every possible information upon the case, and before giving in their declaration candidly and conscientiously to canvass each others opinions, so that erroneous ideas may be removed....

**2nd. The second rule is that of secrecy upon facts with which physicians become professionally acquainted, or are invited to ascertain; such as whether an apparent pregnancy can be real; the gestation and birth of a child; its parentage, colour, and age; the judgment and treatment of syphilitic and gonorrheal disease; the able or disabled state of a person, in limb or constitution; the fallacy of virginity and other circumstances, to the confession of which, a degree of shame, and the idea of exposure is attached, and which are never mentioned but with an engagement to secrecy. This duty has been defined by comparing it to that of the Catholic Confessional, which admits of no disclosures except in cases of treason or murder.** [5]

14.    The second medical society to formalize its understanding of medical ethics in a code was the Baltimore Medico-Chirurgical Society's *System of Medical Ethics*, which published its code in 1832. Prefatory comments to this code address the issue of confidentiality as both a duty incumbent on physicians and an essential for effectively practicing medicine.

No situation or pursuit in life can exact a more rigid adherence to the principles of virtue, integrity, benevolence and humanity, than that of the physician: Indeed, the very nature of his profession renders it requisite that he should possess the utmost probity and purity of character; for, to medical men are confided the dearest and most important interests of human nature. Not only are they the

---

[5] Medical Society of the State of New York. 1823. *A System of Medical Ethics Published by the Order of the State Medical Society of New York.* New York: William Grattan.

guardians of health, and the ministers whose duty it is to soften the pillow of sorrow and affliction, but to them are also intrusted the lives, the honor, and reputation of their patients..... In [physicians] bosom, too, we [patients] find a safe depository for our cares and our confidence, and in their sympathies and friendly admonitions, a mitigation of many of the ills and troubles of existence. – Confident in their virtue and integrity, we can unbosom to them our most secret thoughts and reflections – expose our faults and our foibles – our vices and delinquencies, and while we are encouraged to them by firmness and affliction, and to probity and firmness in our actions, we are secure against any violation of our confidence, or exposure of our faults and infirmities.

In a later section of the Baltimore Society's *System of Medical Ethics* explores the reciprocal relation between the physician's duty of confidentiality and a prerequisite of effective medical practice, the patient's duty of confiding to their physicians.

Patients should faithfully and unreservedly communicate to their physician, the history of the cause of their disease. This is the more important as many diseases of a mental origin simulate those depending on external causes, and yet are only to be cured by ministering to the mind diseased. A patient should never be afraid of thus making his physician his friend and adviser; he should always bear in mind, that a medical man is, or ought to be, under the strongest obligations of secrecy. Even the female sex should never allow feelings of shame or delicacy to prevent their disclosing the seat, symptoms, and causes of complaints peculiar to them. However commendable delicacy of mind may be in the common occurrences of life, its strict observance is medicine may often be attended with the most serious consequences, and a patient sink under a painful and loathsome disease, which might have been readily prevented had timely intimation been given to the physician. [6]

This last point is pivotal to all discussions of medical confidentiality: the effective practice of medicine depends on the willingness of patients to engage with the healthcare system. Any perception that their personal medical information may become public is likely to chill their willingness to engage with the healthcare system, with, as noted in the above paragraph, "serious consequences," such as the failure to prevent treatment of "a painful and loathsome disease."

---

[6] Medico-Chirurgical Society of Baltimore. 1832. *A System of Medical Ethics Adopted by the Medico-Chirurgical Society of Baltimore; Being the Report of the Committee on Ethics, And published by order of the society*. Baltimore: James Lucas and E. L. Deaver.

9 - DECLARATION OF PROF. ROBERT BAKER

15.    In 1847, the American Medical Association was founded and issued its first Code of

Medical Ethics. The code was adopted unanimously by the founding convention, to

which representatives were sent from virtually every regular medical society, medical

school, asylum, and hospital in the US, and, of more relevance to the issues in this case,

many of the larger medical dispensaries (i.e., the pharmaceutical dispensaries of

charitable institutions and hospitals).  In 1855 this code became binding on all regular

healthcare institutions in the US.  Homeopaths and Osteopaths adopted versions of this

code in 1884  and 1904 respectively. Their codes were modeled on the 1847 AMA Code

of Medical Ethics and contain similar sections on confidentiality.

As in precursor codes, the 1847 AMA Code of Medical Ethics formalized

traditions of medical morality dating to Bard, Rush and the colonial period.   The

following two sections deal with confidentiality.

Chap. I, Art. I, Sec. 2.

Every case committed to the charge of a physician should be treated with
attention, steadiness and humanity…. Secrecy and delicacy, when required by
peculiar circumstances, should be strictly observed; and the familiar and
confidential intercourse to which physicians are admitted in their professional
visits, should be used with discretion, and with the most scrupulous regard to
fidelity and honor. The obligation of secrecy extends beyond the period of
professional services-none of the privacies of personal and domestic life, no
infirmity of disposition or flaw of character observed during professional
attendance, should ever be divulged by him except when he is imperatively
required to do so. The force and necessity of this obligation are indeed so great,
that professional men have, under certain circumstances, been protected in their
observance of secrecy by courts of justice.

Patients are held to have a reciprocal duty to confide in their physicians:

Chap. I, Art. II, Sec. 4.

Patients should faithfully and unreservedly communicate to their physician
the supposed cause of their disease. This is the more important, as many diseases
of a mental origin simulate those depending on external causes, and yet are only

10 - DECLARATION OF PROF. ROBERT BAKER

to be cured by ministering to the mind diseased. A patient should never be afraid of thus making his physician his friend and adviser; he should always bear in mind that a medical man is under the strongest obligations of secrecy. Even the female sex should never allow feelings of shame and delicacy to prevent their disclosing the seat, symptoms and causes of complaints peculiar to them. However commendable a modest reserve may be in the common occurrences of life, its strict observance in medicine is often attended with the most serious consequences, and a patient may sink under a painful and loathsome disease, which might have been readily prevented had timely intimation been given to the physician.[7]

16.    We have reason to believe that this notion of confidentiality was enforced by medical societies.    Although medical society records of censure and expulsion are rare, this scholar encountered the following case in the records of the New York Academy of Medicine (NYAM).

17.    **The Expulsion of James Marion Sims for breaching patient confidentiality**.

On November 11, 1869 Thomas C. Finnell (1826-1890), head of the Committee on Ethics of the New York Academy of Medicine (NYAM, founded 1847 and still functioning), charged a famous surgeon, J. Marion Sims (1813-1883), with violating confidentiality at the expense of a celebrity patient, the actress, Charlotte Cushman (1816-76), who was famous for her performances of Shakespeare and notorious for her open lesbianism. The charge read:

> An eminent woman [Charlotte Cushman] applied to Sims for professional advice, the disease is mentioned [in a letter Sims wrote to the *New York Times*] and the Advice given is fully set forth. It is further stated that the patient "unfortunately followed other Advice"—An unjust and injurious reflection upon the professional advisors under whose care she saw fit to place herself for an operation concerning which there is great latitude of Opinion amongst Surgeons.
>
> A portion of Paragraph 2, Article 1, "On the Duties of Physicians to their Patient," is as follows: "Secrecy and delicacy, when required by

---

[7] Baker, Robert and Arthur Caplan, Linda Emanuel, and Stephen Latham, eds. 1999. *The American Medical Ethics Revolution*. Baltimore: the Johns Hopkins University Press, Appendix C, p. 324, 326.

peculiar circumstances, should be strictly observed. . . The obligation of secrecy extends beyond the period of professional services-none of the privacies of personal and domestic life, no infirmity of disposition or flaw of character observed during professional attendance, should ever be divulged by him except when he is imperatively required to do so."

The undersigned claims that the Code does not allow a physician to announce to the public, the disease of a patient, and that the communications of Dr. J. M. Sims is a violation of these paragraphs from which these quotations were made.

It is not improper to state that a leading daily paper in this city [The *New York Times*] upon the communications that its author made a statement in regard to the lady, entirely uncalled for, and thereby advertised himself as her physician.

The undersigned makes these charges from no malice; it is to him as to many others, a source of deep regret that one whose name is so honorably linked to the fame of our profession [i.e. James Marion Sims], should be placed in such a discreditable position but loyalty to our Code demands that all should be called to account whenever they appear guilty of violating any of its Articles.

After a review of the letter published in the New York Times, and reflection on the explanation offered by Sims in his defense, the committee "declared that the charges against Dr. J. Marion Sims are fully sustained and [that he be publicly] reprimanded by the President of the Academy." Rather than face such a public humiliation, with its requisite demand for a public apology, Sims took a steamer to London.

18.   To review briefly, colonial American physicians inherited from Edinburgh, and more generally from the Hippocratic tradition, ethical conventions of confidentiality that were taught in American medical schools by teachers like Bard and Rush, and that were later formalized when American medical societies began to draft formal codes of ethics. When a colonial or early republic physician, like Samuel Bard, treated a patient, like George Washington, both physician and patient understood that what passed between, and what the physician observed in the course of medical practice, was to be kept

12 - DECLARATION OF PROF. ROBERT BAKER

confidential.   This presumption extended to whatever scripts physicians wrote to be prepared by an apothecary or compounding pharmacist. Based on my knowledge of the history of American medical ethics, it is my conclusion that our nation has a longstanding tradition of valuing and protecting medical confidentiality.  This tradition was firmly in place at the time of the Fourth Amendment's ratification in 1791, was known to the Constitution's framers, and continued into the nineteenth century and beyond.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Robert Baker

Dated: June 2 8, 2013

13 - DECLARATION OF PROF. ROBERT BAKER

# EXHIBIT A

## Curriculum Vitae 2013

### Robert Baker, PhD

William D. Williams Professor of Philosophy, Union College
Director, Rapaport Ethics Across the Curriculum Initiative, Union College
Director, Center for Bioethics & Clinical Leadership, Union Graduate College
Director & Professor of Bioethics, The Union Graduate College-Icahn Mount Sinai Bioethics Program

| | |
|---|---|
| Department of Philosophy | Center for Bioethics |
| Humanities Building 020 | 80 Nott Terrance |
| Union College | Union Graduate College |

Schenectady, New York 12308
(518) 388-6215
(518) 631-9862
bakerr@union.edu
bakerr@uniongraduatecollege.edu

### EDUCATIONAL HISTORY

| | |
|---|---|
| 1959 | BA with Honors in History, City College of New York |
| 1967 | Ph.D., University of Minnesota: *Moore's Realism and Non-Natural Properties* |
| 1974 | Council of Philosophical Studies Institute on Medicine and Morals, Haverford College |
| 1977-78 | Fellow, Department of Preventive and Community Medicine, Albany Medical College |

### APPOINTMENTS and POSITIONS

| 1964-1965 | University of Minnesota | | Instructor |
|---|---|---|---|
| 1965-1969 | University of Iowa | 1965-67 | Instructor |
| 1967-1969 | | | Assistant Professor |
| 1968-1969 | Iowa Philosophical Society | | President |
| 1969-1973 | Wayne State University | | Assistant Professor |
| 1973- | Union College | 1973-80 | Assistant Professor |
| | | 1976- | Coordinator, National Health Systems Term Abroad |
| | | 1979- | Director, Health and Human Values Proseminar |
| | | 1980-88 | Associate Professor |

Robert Baker, *Vitae*, 2013 page-3

|           |                                              |           |                                                          |
|-----------|----------------------------------------------|-----------|----------------------------------------------------------|
|           |                                              | 1982-95   | Chair, Human Subjects Research Committee (IRB)           |
|           |                                              | 1984-88   | Director, CHUC, (Computer Based Humanities Curriculum Project) |
|           |                                              | 1989-     | Professor of Philosophy                                  |
|           |                                              | 1991-96   | Chair Philosophy Department                              |
|           |                                              | 1998-01   | Chair, Faculty Appeals Com.                              |
|           |                                              | 2000-01   | Chair Philosophy Department                              |
|           |                                              | 2000-02   | Director, Center for Bioethics                           |
|           |                                              | 2005-     | Director, Rapaport Ethics Across the Curriculum Initiative |
|           |                                              | 2006-     | William D. Williams Professor                            |
|           |                                              | 2006-     | Chair, Subcouncil on Academic Integrity (to establish Honor Code) |
|           |                                              | 2007      | Baccalaureate Keynote Speaker                            |
| 1981      | NYU Medical Center                           |           | Visiting Associate Professor                             |
| 1982, 94-95 | Kennedy Institute of Ethics                |           | Visiting Scholar                                         |
| 1987-88, 94 | Wellcome Institute for the History of Medicine |       | Visiting Scholar                                         |
| 1995      | New York University                          |           | Scholar-in-Residence                                     |
| 1996-2012 | Center for Bioethics, University of Pennsylvania |       | Visiting Fellow                                          |
| 1997-05   | Center for Medical Ethics, Alb. Medical College |       | Associate                                                |
| 1998      | New York University                          |           | Scholar-in-Residence                                     |
| 1998-     | American Society of Bioethics and Humanities |           |                                                          |
|           |                                              | 1998-     | Founding Chair, History of Medical Ethics Affinity Group; |
|           |                                              | 1998-2003 | Archives & History Com.                                  |
|           |                                              | 2005-2007 | Advisory Committee on Ethics Standards (ACES)            |
|           |                                              | 2010-     | Chair Joint ASBH-ASBD Taskforce on Accreditation, chair |
|           |                                              | 2010-     | CECA Taskforce on Ethics Codes, Consultant              |
| 2000-06   | *American Journal of Bioethics*              |           | Editorial Board                                          |
|           |                                              | 2005-06   | Editor History Medical Ethics                            |
| 2002      | University of Mumbai (Bombay)                |           | Hyderabad/Sind National Collegiate Board Professor       |
| 2003-     | The Graduate College of Union University     |           | Professor of Bioethics,                                  |
|           |                                              | 2003- 13  | Director, Center for Bioethics                           |
| 2005-06   | Alden March Bioethics Institute              |           | Chair                                                    |
| 2005      | Institute of Ethics, American Medical Association |       | Visiting Scholar In Residence                            |

Robert Baker, *Vitae*, 2013 page-4

2006-2008    American Philosophical Association         Committee Medicine & Philosophy

2007-2013    Union Grad College-Mt Sinai School Medicine Bioethics Program         Director

2007-         *Bioethics*                                         Editorial Board

2012         UNESCO: Bioethics Education Scientific Committee

2013         Scientific Committee of the International Conference on Clinical Ethics and Consultation.


## SCHOLARSHIPS, FELLOWSHIPS, GRANTS & HONORS


1969   *National Endowment for the Humanities Junior Research Fellowship* conjoined with
       *Old Gold Research Fellowship,* summer (University of Iowa): normative ethics.

1974   *Council of Philosophical Studies Summer Study Gran*t (Rockefeller Brothers Fund):
        to study at the Institute on Morals and Medicine at Haverford College

1974-75 *National Endowment for the Humanities Selected Fields Fellowship*:
       to study social history of medicine at the Wellcome Institute for the History of Medicine.

1976-77 *Mellon Fellowship* (Union College) to study the History of Medicine under Professor
       William Bynum of the Wellcome Institute of the History of Medicine.
       held conjointly with Mellon Fellowship (Union College) to undergo clinical internships at the
       Albany Medical College:  Departments of Neonatology (supervised by Dr. A. Bartoletti);
       Oncology (supervised by  Dr. J. Horton) and Psychiatry (supervised by Dr. I. Hassenfeld).

1981-82 *Ethical Values In Science and Technology* Interdisciplinary Fellowship (NEH-NSF):
       Eighteen-month field-study of the moral methodologies of intensive care units; conducted at the
       Kennedy Institute of Bioethics, Georgetown  University; and the Department of Urban Health
       Affairs, NYU Medical Center.

1984-86 *Computers in the Humanities Undergraduate Curriculum* (CHUC): funded by a Digital
       Equipment Corporation Special Interest Grant Program and the Sloan Foundation-
       to direct a 13 faculty project integrating computers into Humanities (1.2 million dollars).

1994-1995 *American Philosophical Society*: Travel grant to visit archives and libraries in Britain & U.S.
       as part of on-going research project on the history of modern medical morality.

1996-1997 *Wood Institute Fellowship* College of Physicians of Philadelphia, for research on the
        history of American medical ethics.

Robert Baker, *Vitae*, 2013 page-5

1999-2002 *NEH Collaborative Research Grant* (co-recipient with L. McCullough) in support of the Cambridge University Press volume *A History of Medical Ethics*.

2000    NEH-Earhart foundation-Greenwall Foundation-Litauer-Milbank Memorial Funds. Matching grant to support International Conference on the History of Medical Ethics and *A History of Medical Ethics* (co-recipient, L. McCullough).

2001    *Greenwall Foundation Presidential Grant* (co-recipient w. L. McCullough) in support of the International Dictionary of Bioethics Project.

2004- 08 *Fogarty Center, National Institutes of Health* "E-Education in Research Ethics: Central and Eastern Europe." Associate Project Director (Principle Investigators: M. Strosberg and E. Gefanis).  Four year training grant offering Advanced Certificates in Research Ethics via on-line education to develop research ethics infrastructure in Central and Eastern Europe, including countries that were formerly part of the Soviet Union.

2005-12  Michael Rapaport (donor) "Everyday Ethics Across the Curriculum Initiative" funding ethics segments in non-philosophy courses at a highly selective liberal arts college (R. Baker, Chair)

2007    *Nathan Litauer Foundation Grant* for *Cambridge World History of Medical Ethics*

2008    John Conley Foundation Grant (in support of National Undergraduate Bioethics Conference XI)

2012    BioMedLib: Most Referenced Article in the Domain of Article 12221504,
Since Publication "Bioethics and history." Baker R:  *J Med Philos*; 2002 Aug; 27(4):447-74

## BOOKS

1975    *Philosophy and Sex* (ed. with F. Elliston), Prometheus Books, Buffalo.

1984    *Philosophy and Sex* (2nd ed. with F. Elliston), Prometheus Books, Buffalo.

1990    *Rationing America's Health Care: The Oregon Plan and Beyond*, (ed. with M. Strosberg and J. Weiner), Brookings Institution, Washington DC

1993    *The Codification of Medical Morality: Historical and Philosophical Studies of the Formalization Of Medical Morality in the Eighteenth and Nineteenth Centuries* :  Volume I, *Medical Ethics and Etiquette in the Eighteenth Century;*  (ed. with D. and R.  Porter) Kluwer Academic, Dordrecht, NL.

*1995    The Codification of Medical Morality: Historical and Philosophical Studies of the Formalization Of Medical Morality in the Eighteenth and Nineteenth Centuries Volume II, Anglo-American Medical Ethics and Medical Jurisprudence in the Nineteenth Century;* Kluwer Academic,

Robert Baker, *Vitae*, 2013 page-6

Dordrecht. NL

*Legislating Medical Ethics: A Study of New York State's Do Not Resuscitate Law* (ed. with M.Strosberg), Philosophy and Medicine Series, Kluwer Academic Pub., Dordrecht. NL

1998   *Philosophy and Sex* (3rd ed. with F. Elliston & K. Wininger), Prometheus Books, Buffalo.

1999   *The American Medical Ethics Revolution: How the AMA's Code of Ethics Has Transformed Physicians' Relationships to Patients, Professionals and Society* (ed. with A. Caplan, L. Emanuel, S. Latham), Johns Hopkins University Press, Baltimore, MD. ["**Outstanding academic title published in 2000,**" *Choice*, January 2001]

2006   *Ethics and Epidemics* (ed. with J. Balint, S. Philpott, M. Strosberg). Oxford & Amsterdam: Elsevier.

2009   *Philosophy and Sex*, 4th (ed. with K. Wininger), Buffalo: Prometheus Books

2009   *The Cambridge World History of Medical Ethics*, (ed. w. L. McCullough)

New York: Cambridge University Press
Winner American Library Association's *Choice*
**Outstanding Reference/Academic Book Award 2009,**
Category: Outstanding Academic Book in Health Sciences 2009
(Choice: Current Reviews for Academic Libraries 47.5 (Jan.2010): p. 813)

**Chapters by R. Baker:**
**R. Baker and L. McCullough co-authored chapters/sections as follows:**
Chapter 1 "What is the History of Medical Ethics," pp. 3-15
Part II "A Chronology of Medical Ethics," pp. 21-100
Chapter 18 "Discourses of Philosophy and Medical Ethics," pp. 281-312
**R. Baker authored the following chapters/sections**
Chapter 36 "The Discourses of Practitioners in Nineteenth- and Twentieth Century Britain and the United States," pp. 446-464
**R. Baker authored the following Biographies**
Alexander, Leopold (Leo), p. 693
Beck, Theodoric, Romeyn, pp. 696-697
Burns, Chester, p. 698
Cannon, Bradford, p. 698-699
Gisborne, Thomas, p. 702
Hays, Issac, pp. 704-705
Hellegers, André Eugène Désiré Joseph, pp. 705-706
Hippocrates, p. 707
Ivy, Andrew Conway, p. 710
Ryan, Michael, p. 718
**R. Baker and C. Burns co-authored the following Biography**
Hooker, Worthington, p. 709

**In Press**

*Before Bioethics: A History of American Medical Ethics from the Colonial Period to the*

Robert Baker, *Vitae*, 2013 page-7

*Bioethics Revolution.* Oxford University Press (2013)

## BOOK SERIES

1998-  Editor (w. L. McCullough) *Classics of Medical Ethics,* Springer

## PUBLICATIONS

1967  "Particulars:  Bare, Naked and Nude," *Nous*, Vol. I, No. 2.

*Exercises in Logic* (with D. Burnham Terrell), New York,  Holt Rinehart and Winston.

1971  "Alice, Bergmann and the Mad Hatter," *Review of Metaphysics*, Vol. 24,  No. 4.

1972  *Medico-Behavioral Report of the Governor's Taskforce on Victimless Crime*
(Wilson, T.G.G., Baker, R., Fisher, C., Nichloson, W.N., Lowinger, P. et al..), Office of Drug
  Abuse, State of Michigan, E. Lansing, Michigan.

1974  "Prolegomena to an Analysis of Victimless Crime," *Journal of Psychedelic Drugs*, Vol. 1
October, pp. 447-464.

1977  "Report" and "Ceasing to Save," *Reports of the Institute Fellows 1977-78, Institute on
Human Values in Medicine*, Philadelphia, Report 11, pp. 7-11, 145-180.

1978  "Eugenics and Human Rights," in Bandman, E. and Bandman, B. *Bioethics and Human Rights: A
Reader for Health Care Professionals*, Little Brown, Boston, 1978,98-100.

"Mental Illness: Defined," *Encyclopedia of Bioethics*, edited by Reich, W., Free Press,
Macmillan, New York, 1978, Vol. 3, pp. 1090-1097.

Violence and Therapy," *Encyclopedia of Bioethics*, ibid., Vol. 4, pp. 1689-1693.

"Protecting the Unconceived," in Davis, John et al.*, Contemporary Issues in Biomedical
Ethics,* Humana Press, Clifton, New Jersey, 1978, pp. 89-100.

"Social Control and Medical Models in Genetics," in Buckley, John, *Genetics Now:
Ethical  Issues in Genetic Research,* University Press of America, DC, 1978, 75-139.

1980  "Thomas Szasz, Founder of the Philosophy of Psychiatry," Grenander, M. E., ed.
*Aesclepius at Syracuse: Thomas Szasz, Libertarian Humanist*, Institute for
Humanistic Studies, State University of New York, April 1980, Vol. I, pp. 292-314.

"Care of the Sick and Cure of Disease: Comments on the Fractured Image,"
 *Nursing: Images and Ideals,* Spicker, S. and Gadow, S., eds. Springer,

Robert Baker, *Vitae*, 2013 page-8

New York, 1980, pp. 41-48.

1982    "Moral Methodologies of Intensive Care Units," *American Philosophical Association Newsletter on Philosophy and Medicine* No 14, March 1982 pp. 5-6.

1983    "On Euthanasia" in Humber, J. et. al. *Biomedical Ethics Reviews*: *1983* , Humana Press, Clifton, New Jersey.

1984    "The Patient Who Wants to Fight" in Reiser, S. et. al. *The Machine at the Bedside: Strategies for Using Technology in Patient Care,* Cambridge Univ. Press, pp. 213-221.

1985    "Recent Books in Bioethics" *Ethics* ,Vol. 95, No. 2, January, 1985 pp. 370-375.

1986    "The Clinician as Sexual Philosopher" in Shelp, E., ed., *Sexuality and Medicine,* Vol. 2, D. Reidel, Dordrecht, Netherlands

1987    "Ethics and The Management of Critical Care Units" in Fein, I. A., and Strosberg M. *Managing the Critical Care Units,* Aspen Publications, Rockville Md. and Tumbridge Wells (UK), pp. 247-263.

1989    "Caring for the Critically Ill: Proposals for Reform" (with. I. A. Fein, M. Strosberg, and M. Weil) *Rationing of Medical Care for the Critically Ill* , Strosberg, M., and Fein, I. A., eds. Brookings Institution, Washington DC

"The Evolution of DNR Policy" *Rationing of Medical Care for the Critically Ill,* Strosberg M,  and Fein I. A. eds. Brookings Institution, Washington DC, pp. 52- 63.

"Research on Brain-Dead Patients" *Annals of Internal Medicine* Vol. 110, 1 January 1989 p. 88 (letter).

Review of  Melhado, E. et. al. *Money, Power and Health Care* in *Medical History*, 33 January 1989 pp. 139-140.

"The Skeptical Critique of Clinical Ethics" in Hoffmaster, B., Freedman, B. and Fraser, G, *The Foundations of Clinical Ethics,* Humana Books, Clifton NJ, pp. 27-57.

1990    "Physicians' Attitudes Towards Using Deception" (w Dersch et al.) *JAMA* , Oct. 27, 1989, 266, 16, p. 2233. (Letter)

Review: *Children in Health Care,* in *Ethics,* 100, 4 July, p. 924.

"The Inevitability of Health Care Rationing: A Case Study of the British National Health Service" in *Rationing America's Health Care: The Oregon Plan and Beyond*, (ed. with

Robert Baker, *Vitae*, 2013 page-9

M. Strosberg and J. Weiner), Brookings Institution, Washington DC, pp. 208 - 230.

1991    "Ethical Implications of New York's DNR Law" (with Dersch et al.)
*Critical Care Medicine*, 18, April 1990, S255.

"The Intelligent Anesthesiologist's Guide to the Logic and Language of Allocation," with I. A. Fein, and M. Strosberg, *Anesthesiology Clinics of America: Critical Issues in Critical Care*, Vol. 9, No. 2, June 1991, pp. 437-486. 1992

"Triage and Equality:  A Historical Reassessment of Utilitarian Analyses of Triage" (with M. Strosberg), *Kennedy Institute of Ethics Journal,* Vol. 2, pp. 103-124.

1991    "Invisibility and the Just Allocation of Health Care: A Study of the British National Health Service," *Newsletter European Society for Philosophy of Medicine & Heath Care,* No 12, 28-29.

"Medical Ethics in a Time of De-Communization," *Kennedy Institute of Ethics Journal*, Vol . 2, pp. 363-370, December.

1993    "Deciphering Percival's Code" in *The Codification of Medical Morality*, Volume I, pp. 179-212.

"The Bioethical Revolution of 1988: The Future of the Futility Controversy" (with M. Strosberg), in Blank, R. and Bonnicksen, A., *Emerging Issues in Biomedical Policy: Volume II:  Debates Over Medical Authority:*, New York, Columbia University Press, pp. 57-78.

"The Ethics of Medical Futility," *Critical Care Clinics 1993*, Vol. 9, pp. 575-584.

"History of Medical Ethics," *Encyclopedia of the History of Medicine*, Bynum, W. and Porter, R., eds., Routledge, London.

"Visibility and the Just Allocation of Health Care:  A Study of Age-Rationing in the British National Health Service," *Health Care Analysis*, Vol. 1, No, 2, pp. 1-22.

"Professional Integrity and Global Budgeting, A Study of Physician Gatekeeping in the British National Health Service," *Professional Ethics,* Vol. 2, pp. 1-34.

Review of Albert Jonsen's, *The Old Medicine and the New Ethics*, in *Medical  History*, Vol. 37, pp. 112-113.

Review of David Rothman's, *Stranger's at the Bedside  A History of how Law*

Robert Baker, *Vitae*, 2013 page-10

*and Bioethics Transformed Medical Descisionmaking,* in *Medical History,* Vol. 37, p. 113.

Review of José Luis Peset and Diego Gracia's *The Ethics of Diagnosis*, in *Medical History.* Vol. 37 p.   .

1994    "Rationing, Rhetoric, and Rationality: A Review of the Health Care Rationing Debate in America and Europe," in Humber, J. And Almeder, R., *Allocating Health Care Resources(Biomedical Ethics Reviews: 1994)*, Humana Press, Totowa, NJ., pp. 55-84.

"Rationing Intensive Care," (Letter, w. M. Strosberg), *JAMA*, 272, pp. 1480-1481.

1995    "The Ethics of Global Budgeting: Some Historically Based Observations," *The Journal of Clinical Ethics*, Vol. 5, pp. 343-346

"Conceptions of Mental Illness," in Warren Reich, ed. *Encyclopedia of Bioethics,* New York, Macmillan, Vol. III, pp.  1731-1743.

1996    Review of Larry Churchill's *Self-Interest and Universal Health Care*, in *Ethics* , Vol. 106, pp. 497-498.

Resistance To Medical Ethics Reform In The Nineteenth Century" *Malloch Room Newsletter of The New York Academy of Medicine.*, 13, Spring 1996.

"Age Discrimination," in Joseph Bessette, ed., *Ready Reference: American Justice*, Pasadena (CA), Vol. I, pp. 17-20

"The Impact of Legislation Requiring DNR Orders: New York State Compared to Neighboring States," (with Daniel Teres, Keith Boyd, John Rapport, Martin Strosberg, and Staley Lemeshow), *Journal of Intensive Care Medicine,* 11, pp. 335-342.

"Recent Works in the History of Medical Ethics and Its Relevance to Bioethics,"   *American Philosophical Association Newsletters,* Vol. 96, 1, Fall 1996, pp. 90-97.

1997    "The Kappa Lambda Society of Hippocrates:  The Secret Origins of the American Medical Association," *Fugitive Leaves* , Third Series, Volume 11, Number 2, College of Physicians of Philadelphia.

Robert Baker, *Vitae,* 2013 page-11

"Advisory Committee on Human Radiation Experiments, *The Human Radiation  Experiments* " review in *Medical History*, 41, pp. 256-257.

"Crisis, Ethics and the American Medical Association:  1847 and 1997" with Arthur Caplan, Linda Emanuel, and Stephen Latham, *JAMA*: *Journal of the American Medical Association*, 278, pp. 163-164.

"Hans-Georg Gadamer, *The enigma of health: the art of healing in a scientific age,*" review in *Medical History*, 41, 397-399.

"Un modelo teórico para la ética mética transcultural:  posmodernismo, relativismo y el Codigo de Nuremberg," *Perspectivas Bioéticas en las américas*, 2, 1997, 12-37.

"Transkulturelle Medizinethik und Menschenrechte," in Ulrich Tröhler and Stella Reiter- Theil, *Ethik und Medizin 1947-1997:  Was leistet die Kodifizierung von Ethik?* Göttingen, Wallstein Verlag, pp. 433-460.

Contributor to *New York's Health Care System:  Making the Transition to Managed Care and Competition*, Martin Strosberg, ed., Troy NY, Educator's International Press, pp.43-44, 76, 87.

1998    "Extending the Canon:  Applied Ethics in Eighteenth-Century Britain." *British Society for the History of Philosophy Newsletter'*, New Series: Vol. 2., No. 2, Oct. 1998, pp. 24-28.

"Multiculturalism, Postmodernism And The Bankruptcy Of Fundamentalism," *Kennedy Institute of Ethics Journal*, Vol. 8, # 3, September, 1998, pp. 210-231

"A Theory Of International Bioethics," *Kennedy Institute of Ethics Journal*, Vol. 8, # 3, September, 1998, pp.233-274.

"Transcultural Medical Ethics and Human Rights," *Ethics Codes in Medicine: Foundations and achievements of codification since 1947*, Ulrich Tröhler and Stella Reiter-Theil eds., Aldershot, UK, pp.312-331 (English translation of German article published in 1997).

"Negotiating International Bioethics: A Response to Tom Beauchamp and Ruth Macklin" *Kennedy Institute of Ethics Journal*, Vol. 8, No. 4,  pp. 423-455.

1999    "American Independence and the Right to Medical Care," *JAMA: Journal of the American Medical Association*, Vol. 281, March 3, 1999, pp. 859-860.

Robert Baker, *Vitae*, 2013 page-12

"The Birth of Bioethics: A Review Article," *APA Newsletters*, *Newsletter on Philosophy and Medicine,* Vol. 98, No. 2, Spring, pp. 143-145.

"Albert R. Jonsen: *The birth of bioethics,*" review in *Medical History*, July 1999, pp. 403-404.

"Minority Distrust Of Medicine: A Historical Perspective," *Mount Sinai Journal of Medicine*, Vol. 66, September, pp. 212-222.

2000    "The Efficacy of Professional Ethics: The AMA Code of Ethics in Historical and Current Perspective," with Linda Emanuel, *Hastings Center Report* 30, no. 4, S13-17.

"Codes of Ethics: Some History," *Perspectives on the Professions*, 19, No. 1, pp. 3-6.

2001    Review of Laurence McCullough, *John Gregory and the Invention of Professional Medical Ethics* and *John Gregory's Writings on Medical Ethics and the Philosophy of Medicine*, in *Medical History* 45: 1, pp. 121-123, January.

"The Facts of Bioethics," *American Journal of Bioethics*, 1, pp. 59-62.

"Transplantation: A Historical Perspective," in Shelton, W. ed. *Advances in Bioethics: Volume 7: The Ethics of Organ Transplantation*, Elsevier Science Publications, pp. 1-42.

"Bioethics and Human Rights: A Historical Perspective," *Cambridge Healthcare Quarterly*, Volume 10, 241-252

*2002*    Review: Bioethics in America, M.L. Tina Stevens," *Journal of the History of Medicine and Allied Sciences.*

"Stem Cell Rhetoric and the Pragmatics of Naming," *AJOB: American Journal of Bioethics*, 2:1, 52-53.

"The Co-Evolution of Bioethics and Cyberspace," *American Philosophical Association Newsletter on Philosophy and Medicine*, *APA Newsletters*, V 1, Spring 02, 160-164.

"On Being a Bioethicist - Review of *Playing God* by John H. Evans": *AJOB: American Journal of Bioethics*: 2:2, 65-69

"Bioethics and History," *Journal of Medicine and Philosophy*, Vol 27, No. 4, 449-476

[BioMedLib: 2012 the most cited article in its field on the 10th anniversary of its publication]

Robert Baker, *Vitae,* 2013 page-13

"From Metaethicist to Bioethicist," *Cambridge Quarterly of Healthcare Ethics*, Vol 11, No. 4, 369-378

2003  "Balkanizing Bioethics," *AJOB:  American Journal of Bioethics*, 3:2, 13-14.

2004  "Bias in Journalistic Accounts of Embryo Research Reconsidered," *AJOB:  American Journal of Bioethics*, 4: (1), 15-16.

2005  "Getting Agreement: How Bioethics Got Started" *The Hastings Center Report,* 35 (3), 50-51

"A Draft Model Aggregated Code of Ethics for Bioethicists" *American Journal of Bioethics* 5 (5), 33-41.

"Response to Commentators on "A Draft Model Code of Ethics for Bioethics" *American Journal of Bioethics* 5 (5) W 12-13.

"International Bioethics and Human Rights: Reflections on A Proposed Universal Declaration on Bioethics and Human Rights," *Politics and Ethics Review* 1 (2), 188-196.

2006  "Ethics, Professional Codes of," in A. Soble ed., *Sex From Plato to Paglia: A Philosophical Encyclopedia.*  Westport (CN): Greenwood Press, 268-272.

"Confidentiality in Professional Medical Ethics. " *American Journal of Bioethics* 6: 39-41.

"A Theory of International Bioethics: Multiculturalism, Postmodernism and the Bankruptcy of Fundamentalism.  In Belinda Bennett, ed. *Health, Rights and Globalisation*, pp. 201-231. Aldershot (UK): Ashgate Publishing Ltd. (Edited version of 1998 article of same title.)

"Medical Ethics and Epidemics: A Historical Perspective."  In J. Balint, S. Philpott, R. Baker, and M. Strosberg eds. *Ethics and Epidemics,* Amsterdam, Elsevier, pp. 93-134.

*Report and Recommendations of the ASBH Advisory Committee on Ethics Standards (ACES)* with K. Kipnis, R. Pearlman, and H. Taylor (www.asbh.org)

Review "Ian Dowbiggin: *A Concise History of Euthanasia: Life, Death God, and Machine*." *Bulletin of the History of Medicine*, 80, 789-790.

Review "Robert M. Veatch: *Disrupted Dialogue: Medical Ethics and the Collapse of Physician-Humanist Communication (1770-1980)*," *Bulletin of the History of Medicine* 80, 790-791.

2007  "Medical Ethics' Appropriation of Moral Philosophy: The Case of the Sympathetic and the Unsympathetic Physician" with L. McCullough, *Kennedy Institute of Ethics Journal*

Robert Baker, *Vitae*, 2013 page-14

17 (1) 3-22.

"A History of Codes of Ethics for Bioethicists" *The Ethics of Bioethics: Mapping the Moral Landscape*, Lisa Eckenweiler and Felicia Cohen, eds. Baltimore: Johns Hopkins University Press, 24-42.

"Bergmann as Historian," *Ontology and Analysis: Essays and Recollections about Gustav Bergmann.* L. Addis ed., Frankfurt: Ontos Verlag, 51-58.

"The Relationship Between Moral Philosophy and Medical Ethics Reconsidered" with L. McCullough, *Kennedy Institute of Ethics Journal* 17 (3), 271-276.

2008   "African American Physicians and Organized Medicine, 1846-1968, Origins of a Racial Divide," Baker, R., Washington, H., Olkanmi, O.,  Savitt, T., Jacobs, E., Hoover, E., Wynia, M., *JAMA: Journal of the American Medical Association*, Vol. 300, No. 3. July 16, 2008, pp. 306-313.

"Medical Ethics and Epidemic Disease," *Encyclopedia of Pestilence, Pandemic* Byrne, Joseph, P. ed., Westport (CT), Greenwood Press, pp. 422-428.

"Codes of Medical Ethics," *Encyclopedia of Pestilence, Pandemic* Byrne, Joseph, P. ed., Westport (CT), Greenwood Press, p. 427.

2009   Review "Robert Veatch:  *Disrupted Dialogue" The Journal of Religion,* 89:134–136, January 2009**.**

"The Ethics of Bioethics" in Vardit Ravitsky, Autumn Fiester, Arthur L. Caplan, eds., T*he Penn Center Guide to Bioethics,*  New York: Springer Publishing Company, pp. 9-20.

"In Defense of Bioethics," *Journal of Law Medicine and Ethics*, 37 (1), February, pp. 83-92.

"Conscience and the Unconscionable," *Bioethics*, 23 (5), pp. ii-iv.

Baker, R, Washington, H., Olakanmi, O. et al. "Creating a Segregated Medical Profession: African American Physicians and Organized Medicine, 1846-1910, " *Journal of the National Medical Association*, 101 (6) June, 501-512.

Washington, H, Baker, R, Olakanmi, O., et al. "Segregation, Civil Rights, and Health Disparities: The Legacy of African American Physicians and Organized Medicine, 1910-1968," *Journal of the National Medical Association*, 101 (6) June, 513-527.

Pease, Anastasia, Baker R. "Union College's Rapaport Ethics Across the Curriculum Initiative,"

*Teaching Ethics*, Vol. 9 (2) pp. 5-24.

2010    Baker, R. "Review: Renee C. Fox and Judith Swazey. *Observing Bioethics*," *Bulletin of the History of Medicine,* Vol. 84 (1), Spring 2010, pp. 155-56.

Philpott, S., Baker R. "Why the Avandia Scandal Proves that Big Pharma Needs Stronger Ethical Standards." *Bioethics*, Vol. 24 (8), pp. ii-iii.

2011.   Baker, R. "Historical Context of Bioethics:" Three part series on the history of bioethics, video of Baker's January GLEUBE lecture at the Manchester Bioethics Center (UK), published by European Bioethics: http://www.youtube.com/watch?v=b11P0IAdoKw; http://www.youtube.com/watch?v=U2f57ZpMtKc; http://www.youtube.com/watch?v=H6YYvAE_5Ao

2012    Baker, R. 2012. "Medical Ethics, History of," Chadwick, R. *Encyclopedia of Applied Ethics*, 2nd edition, London & San Diego: Elsevier, Vol. 3, pp. 61-69

Baker, R., 2012.  "Medical Oaths and Codes," Chadwick, R. *Encyclopedia of Applied Ethics*, 2nd edition, London & San Diego: Elsevier, Vol. 3, pp. 155-163

### In Press

Baker, R. "Codes of Conduct," in ten Have, Henk; Gordijn, Bert eds. *Springer Compendium & Atlas of Global Bioethics*.  London: Springer.

Baker, R. "Review of *Hippocratic, Religious, and Secular Medical Ethics* by Robert Veatch," *Bioethics*.

Baker, R. "Race and the History of the Medical Profession," in William C. Cockerham, Robert Dingwall, and Stella Quah**,** eds.  *The Wiley-Blackwell Encyclopedia of Health, Illness, Behavior, and Society*, forthcoming Wiley-Blackwell.

Baker, R. "Medical Codes and Oaths," in Jennings, Bruce, ed. 4th edition, *Encyclopedia of Bioethics*, forthcoming Macmillan.

### Submitted for Review

Baker, R. "Bioethics and Human Rights: A Historical Perspective," Gordon, John-Stewart, Teas, Wanda, eds. *Global Perspectives On Bioethics*, New York: currently under review, Blackwell.

### CONFERENCES AND LECTURE SERIES ORGANIZED

Robert Baker, *Vitae*, 2013 page-16

1978-   *Health and Human Values Lecture Series*, Union College & Albany Medical College (on-going series).

1989   *Eighteenth Century Medical Ethics*  (w. D and R Porter) Wellcome Institute, London

1990   *New York 's DNR Law* (organized with M. Strosberg) Union College, Schenectady.
       *Nineteenth Century Medical Ethics*  (w. D and R. Porter), Wellcome Institute, London

1991   *Rationing America's Health Care: Opening Pandora's Box*, (w. I. A. Fein, M. Strosberg, and J. Weiner), The Brookings Institution, Washington DC

1993   *Pew Conference on Ethics in Science* (with T. Weiner), Union College, Schenectady.
       *Ethics and the Environment*  (with P. Genest), Union College, Schenectady.

1997   *A Symposium Commemorating the 150th Anniversary of the American Medical Association and its 1847 Code of Ethics* (with A. Caplan, L. Emanuel, & S. Latham),  Philadelphia

1999   *Ethics in Science*, NYU Faculty Resource Network, Faculty Enrichment Program, sponsored by the National Institutes of Health, The Leadership Alliance, and the Community College Transfer Opportunity Program.  One-week enrichment program for faculty from historically Black colleges and universities, and from liberal arts and community colleges, held at NYU, June 7-11, 1999.

2000   *First International Conference on the History of Medical Ethics* (with L. McCullough) Baylor College of Medicine, Houston, September 2000, sponsored by the Collaborative Research Division of the National Endowment for the Humanities, and the Earhart, Greenwall, and  the Littauer Foundations and the Milbank Memorial Fund

2001   Greenwall Foundation sponsored *Editorial Conference on the Cambridge Dictionary of Bioethics* (with L. McCullough), Union College, August, 2001.

2004   *Ethics and Epidemics: An International Conference on the Ethical Dimensions of Epidemic Control*  (with J. Balint and W. Shelton,) March 25-27, 2004 at Albany Medical College and Union College.

       NIH Fogarty *Workshop on E-Education*, Dec. 12-20, 2004 (w. M. Strosberg).

2005   ASBH Spring Conference *Ethics of Bioethics* (w. A. Derse,, J. Balint, G. McGee, W. Shelton, M. Strosberg, M. Wynia), April 7-9 Albany Medical College and Union College

       NIH *Workshop on Research Ethics*, CEE Advanced Certificate in Research Ethics, (w. E. Gefanis,

Robert Baker, *Vitae*, 2013 page-17

and M. Strosberg), Vilnius, Lithuania, 1-10 July.

2007    NIH *Workshop on Research Ethics*, CEE Advanced Certificate in Research Ethics, (w. E. Gefanis, and M. Strosberg), Vilnius, Lithuania, 22-26 June 2007.

8th Annual Global Forum on Research Ethics (w. E. Gefanis and M. Strosberg and international advisory board) Vilnius, 27-29 June 2007.

2008    *National Undergraduate Bioethics Conference* XI, (w. J. Handibode) Union College, April 4-5.

2010:    *Bioethics and Disablity Across the Life Cycle*: (w Alicia Ouellette) Union College 21-22 May.

12th *International Conference of the Society for Ethics Across the Curriculum*, Union College. Oct. 7-9  2010. (Organizer).


## LECTURES, LECTURE SERIES AND WORKSHOPS (1995-)


Seminar/workshop/ Rounds:  "No Room at the Inn: Rationing Health Care"  (w. M. Strosberg:  Sept, 30, 1994 New England Medical Center; Jan. 20, 1994, Albany Medical College; May 18, Albany College of  Pharmacy; May 20, Albany Medical College, January  8, 1996).

"Ethics and Futility," & "Ethics Workshop" 11th Annual Conference on Managing Critical Care Medicine. Albany Oct. 19-20, 2004.

"Age-rationing Reconsidered,," What Do We Owe the Eldery, Hastings Center Conference, Maastricht, Netherlands, October 1994;  International Conference on  Justice in Health Care, Jacksonville, Florida, November 4, 1994

"Business Ethics Workshop,"  College Stores Association of New York State, Binghamton, NY, March 8, 1995.

"Fellows Report", New York University Faculty Resource Network, NYC,  May, 12, 1995

"Medical Ethics and Gentlemanly Honor,"  Consortium on the History of Medicine, New York Academy of Medicine, NYC, May 24, 1995

"Where Business Meets Medical Ethics,"  Health Instruments Manufacturers Association, Vancouver, Canada, June 27, 1995

"The Death of Hippocratic Ethics,"  Ninth Annual Conference of the European Society for the Philosophy of Medicine and Health Care, & the Hippocratic Foundation, 21-23 September, 1995 Kos, Greece

Robert Baker, *Vitae*, 2013 page-18

"Myth and History in Medical Ethics: From the Hippocratic Oath to Doctor Kevorkian's
    Suicide Machine," <u>Making Choices: The History of Conflict in Medical Ethics</u>,
    New York Academy of Medicine, February 8, 1996

"Rethinking the History of Medical Ethics,"  Department of the History and Sociology of
    Medicine and Science, University of Pennsylvania, April 8, 1996

"Transcultural Medical Ethics and Human Rights," <u>Ethical Codes in Medicine</u>
    <u>Conference</u>,   The Freiburg Project of the Akademie für Ethik in der Medizin, Albert-Ludwigs-
    Universität, Freiburg, Germany, April 20-21, 1996.

"The Goals of Medicine: A Historical Perspective,"  Hastings Center Conference on the
     Goals of Medicine, Detroit Michigan, May 11, 1996

"The Postmodern Critique of Bioethics"  American Association of Bioethics,
    San Francisco, Nov. 1996

"The Birth of Bioethics," Conference session, & paper,
    International Association of Bioethics. San Francisco, Nov. 1996

"Uncovering the History of Medical Ethics,"  College of Physicians of Philadelphia,
    Woods Fellow Lecture, Feb. 27, 1997

 "The First American Medical Ethics Revolution," 1997 *Ethics and American Medicine:*
    *History, Change, and Challenge*, Philadelphia. March 14, 1997

"American Medical Ethics, 1847-1997" American Medical Association Leadership
            Conference (w. Arthur Caplan), Philadelphia, March 16, 1997

"The Historiography of American Medical Ethics," Consortium of Historians of
    Medicine,  New York Academy of Medicine, March 25, 1997.

"Doctor Chase's Patent Truss and the Origins of American Medical Ethics,"  Seventieth
    Annual Meeting of the American Association of Historians of Medicine, (with
    Dana Katz) Williamsburg Virgina, April 4, 1997.

"American Medical Ethics, 1847 -1997,"  Ethics Rounds, Albany Medical College, April
    17, 1997.

"History of the Goals of Medicine," The Goals of Medicine: Priorities for the Future," Hastings Center and
    Istituto Ilatiano per gle Studi Filosofici,  Naples Italy, June 19-21, 1997

"Revolutionizing the Researcher-Patient Relationship: A Historical Analysis," XI Annual
    Conference of the European Society for Philosophy, Medicine and Healthcare

Robert Baker, *Vitae*, 2013 page-19

Collegio Antonianium, Padova, Italy, August 23, 1997

"History and Minority Distrust of Medicine,"  Hope, Distrust & Allocation:  Minority
Encounters with the Healthcare System, Issues in Medical Ethics 1998, Mount
Sinai Medical Center, NYC, Feb. 27, 1998

"Who's Afraid of the Big Bad Sheep?  Cloning and Culture Shock,"
Public Affairs. Lecture Series, College of State Island, NY. April 29, 1998

"The History of Medical Ethics,"  Workshop, Faculty Mount Sinai Medical Center,
New York, 22 October 1998

"A Theory of International Bioethics" "Global Bioethics: East and West,"
Fourth World Congress of Bioethics, Tokyo, Japan, 4 November 1998;
Faculty Seminar, Mount Sinai Medical Center, New York 17 December 1998;
Hastings Center, 18 December, 1998; New York University Medical Center, January 27, 1999,

"History and Methodology in Biomedical Ethics" Global Bioethics: East and West,"
Fourth World Congress of Bioethics, Tokyo, Japan, 7 November 1998

"The History of Medical Ethics," Session coordinator and chair, American Society of
Bioethics and Humanities, Houston, Texas, 21 November, 1998.

"History and Bioethics," Commentary, Columbia College of Physicians and Surgeons,
February 26, 1999.

"The Practical Relevance of Codes of Ethics" American Medical Association, Chicago,
March 16 & 18, 1999.

"From Medical Ethics into Bioethics:  The Belmont Report and the Deprofessionalization
of Medical Ethics,"  Belmont Remembered, University of Virginia, April-16-18,
1999

"Ethics Versus Science:  The Impact of the 1880s Anti-Ethics Insurrection on the
American Medical Profession," American Association of Historians of Medicine, Rutgers
University, May 7-9, 1999.

"Professional Autonomy," XI Annual Bioethics Retreat, The Homestead, Virginia 16-19,
June, '99

"The Role of History in Teaching Biomedical Ethics" Ninety-Sixth Annual Meeting of
the American Philosophical Association (Eastern Division) Boston, December 28, 1999

"Nietzsche As Bioethicist," Center for Medical Ethics, University of Virginia, April 8, 2002

Robert Baker, *Vitae*, 2013 page-20

"Ethics Across the Curriculum" (w. R. Cassidy, R. Gurland,), FRN, NYU, Oct. 4, 2002

"Ethics Across the Curriculum" Universidad Sagrado Corazon (San Juan, PR), Oct 16-18, 2002, co-workshop leaders R. Cassidy (RCC) and R. Gurland (NYU)

Director:  "Workshop on Codes of Ethics," 5th Annual Meeting American Society of Bioethics and Humanities, Baltimore Oct. 24, 2002

"E-Consultation: Ethics Consultation over the Internet," Clinical Ethics Consultation: First International Assessment Summit, Cleveland, April 4-6, 2003.

"The Practice of Ethics in the Ancient World," Workshop on Practical Ethics, Faculty Resource Network, New York University, June 4, 2003.

"British and American Conceptions of Medical Ethics, 1847-1947," Anglo-American Medical Relations: Historical Insights.  Welcome Trust Centre for the History of Medicine at University College London:June 19-21, 2003.

"Percival's Medical Ethics: On the 200th Anniversary of Percival's *Medical Ethics*," Joint American Society of Bioethics and Humanities-Canadian Bioethics Society Conference, Montreal, 24 October 2003.

"A Code of Professional Ethics for Bioethicists?" Fifteenth National Bioethics Retreat, Wintergreen Virginia, June 16-20, 2004.

"The Place of Trust in Biomedical Research: Historical Perspectives" Conference on Philosophical Societies Session, One Hundred and First Annual Meeting of the American Philosophical Association, 29 December 2004.

"Codifying the Ethics of Bioethics." ASBH Spring Conference, The Ethics of Bioethics, Albany-Schenectady NY, April 7-9, 2005.

"Ethics for Bioethicists," 17th Annual Bioethics Retreat, Asilomar California, June 12, 2005.

"On A Code of Ethics for Bioethicists,"  Annual Meeting, American Society of Bioethics and Humanities, Washington DC, October 20, 2005.

"The Irony of Professional Autonomy," Professional Standards Group Grand Rounds, American Medical Association, October 28, 2005.

"Ethics During Epidemics, Bio-terrorism and Natural Disasters"  (Panel) 103rd Annual Meeting of the American Philosophical Association, Washington DC, 29 December 2006.

"A Brief History of Research Ethics" and "International Bioethics and Human Rights" for *Certificado de Estudios Superior en Bioética*.  FLASCO: Argentina, Buenos Aires, 14-18 May, 2007;  CEE-NIH

Robert Baker, *Vitae,* 2013 page-21

Advanced Certificate Workshop on Research Ethics, 23 June, Vilnius, Lithuania;  Union College Summer Research Workshop 19 July.

"A Code of Ethics for Bioethicists," (w. K. Kipnis) 19th Annual Bioethics Retreat, Lake George Village, NY, 5 July 2007.

 *"Jüdisches Krankenhaus Berlin,* The Holocaust, and the Moral Imagination of Medicine," Mount Sinai School of Medicine October 2, 2007

"Carrying Codes to Newcastle: Reflections on Benjamin Freedman and the Ethics of Bioethics," *A Tribute to Benjamin Freedman*, Biomedical Ethics Unit of McGill University, 12 October 2007

"Workshop: Codes of Ethics for Bioethicists" (w K. Kipnis, S. Latham, and D. Ozar) ASBH Annual Meeting, October 18, 2007.

"Workshop: Rationing Antivirals in an Avian Flu Epidemic," (organizer, w. D. Brock, D. Perlman, S. Philpott, A. Wertheimer). ASBH Annual Meeting, October 19, 2007.

"African American Physicians and the AMA" ASBH Annual Meeting, October 19, 2007.

"Designing an Ethics Across the Curriculum Program" with Anastasia Pease. Presented at the 9th annual SEAC Conference at the Milltown Institute in Dublin, Ireland, on November 15, 2007.

"A Code of Ethics for Bioethicists," Presented at the 9th annual SEAC Conference at the Milltown Institute in Dublin, Ireland, on November 16, 2007.

"Philosophical Foundations of Bioethics" panel discussion (chair, organizer) Eastern Division Meeting of The American Philosophical Association in Washington, D.C. December 29, 2007.

"A Moral Conservative Approach to Medical Conscience Clauses," Bioethics International Conference 2008, UN Plaza, May 23, 2008.

"Common Morality," panel, 10th Annual Meeting American Society for Bioethics and Humanities, Cleveland, 24 October 2008

"The ASBH: Future, Present and Past Tense," 10th Annual Meeting American Society for Bioethics and Humanities, Cleveland, 2r October 2008

Panel: "African Americans and the AMA," Semi-Annual Delegates meeting, American Medical Association, Orlando Florida, November 10, 2008

"The Union College Approach to Ethics Across the Curriculum," Panel, 10th Annual Meeting Society for Ethics Across the Curriculum, Baltimore, Maryland, 14 November 2008.

"Bioethics: Born in the USA"  & "A Short History of Research Ethics"
NIH Advanced Certificate Workshop on Research Ethics in the Countries of Eastern Europe and the former Soviet Union, Vilnius University, Lithuania, 13-17 June 2009.

"In Conversation with Robert Baker," Conversations with Alan Chartok, WAMC, Albany, NY, August 20, 2009

"Translating Lessons From Medical Education To Clinical Ethics Education," panel, R. Baker, D. Cohen-Tigor, S. Bliss, T. Somer  11th Annual Meeting American Society for Bioethics and Humanities, Washington DC, 17 October 2009.

 "Classic Cases in Bioethics: the Disability Perspective," with Alicia Ouellette, International Conference on *Bioethics and Disability Across the Life Cycle*: Union College 21 May 2010

"From Medical Ethics to Bioethics," (Hi)story of Bioethics Conference, ESRG Centre for Economic and Social Aspects of Genomics, Manchester, UK, January 25, 2011.

"Accrediting Training Programs and Developing a Code of Ethics for Clinical Ethics Consultation" 7th International Conference on Clinical Ethics Consultation, Amsterdam, the Netherlands, 20 May 2011

"On Dying Well: On Death and Dying in America from the Colonial Period to the Bioethics Revolution," Internal Medicine Grand Rounds, Fletcher Allen Medical Center, Burlington, Vermont. May 4, 2012

"Does Bioethics Have A Future?" 11th World Congress of Bioethics, International Association of Bioethics, Rotterdam, the Netherlands, June 29, 2012.

"Seminar on the US Department of Health and Human Services' Advance Notice of Proposed Rule Making for Revisions (ANPRM) to the Common Rule" with Sean Philpott. Capstone Course for the Advanced Certificate Program for Research Ethics in Central and Eastern Europe: Fogarty Program of the US National Institutes of Health, Bioethics Program of Union Graduate College, & Dept. of Medical History and Ethics of Vilnius University, Prague, Czech Republic, July 2, 2012.

## COURSES TAUGHT

### Undergraduate

Advanced Bioethics, Bioethics, Ethics, Ethical Theory, History of Ethics, International Bioethics, Introduction to Bioethics, Professionalism, Philosophy of Medicine, Philosophy of Sex, Preceptorial:  On Life and Death, Seminar On Death and Dying

### Graduate and Postgraduate

"Advanced Bioethics" (E-Course, and on-site course),  "Seminar on International Bioethics" (E-course, taught on-line), Section AMA Course: "The History and Meaning of Ethics and Professionalism in

Medicine." (E-course, taught on-line).  " Professional and Managerial Ethics," Graduate Management Institute, Union College; "Emergence of Modern Medical Morality: From the Enlightenment to the Bioethical Revolution,"" Hudson-Mohawk Consortium (for faculty from Albany Medical College and 28 other schools), "Research Ethics,"
Seminar On Death and Dying."

## ORGANIZATIONAL AFFILIATIONS

American Association of Historians of Medicine, American Philosophical Association, American Society of Bioethics and Humanities (Chair Affinity Group on the History of Medical Ethics), Hastings Center, International Association of Bioethics, Kennedy Institute of Ethics.

## CONSULTING AND REVIEWING

1972-73 Member: Behavioral-Medical Taskforce, Michigan Governor's Taskforce on Victimless

Crime (LEAA Grant 1972 - 33.002).

1978-1986 Referee for Bioethics projects, Social Science and Humanities Research

Council of Canada

1981    General Electric Company:  Ethical Issues DNA Research.

1983-    Confidential consultant on ethics to several hospitals.

1984-    Ethics Committee: Ellis Hospital, Schenectady NY

1985-95 Ethics Committee: Daughter's of Sarah Nursing Home.

1985    Consultant for Humanities Computing, Drew University, NJ; Merrimack College. Ma.

1986    Consultant for Humanities Computing, Rust College, Mississippi

Consultant on Humanities Education. Rensselaer Polytechnic Institution, New York.

1987    Reviewer, Medical Ethics: Cornell University Press.

Consultant on Medical Ethics: New York Academy of Science.

1989    Consultant, Medical Ethics, New York Academy of Science

1992-    Ethics Committee, Sunnyview Rehabilitation Hospital, Schenectady.

Robert Baker, *Vitae*, 2013 page-24

1993    Consultant on Humanities education, Rensselaer Polytechnic Institution, New York Reviewer, *Encyclopedia of Bioethics*

Reviewer, *Medical History*

1996    Grants reviewer, Wellcome Foundation

1997    Reviewer, *Medical History*

Reviewer, *Medical Humanities Review*

Reviewer, Oxford University Press

Reviewer, Wadsworth Publishing Company

1998    Reviewer, McGraw Hill

Reviewer, Wadsworth

Reviewer, *Medical Humanties Review*

1999    Reviewer, Wadsworth

Reviewer Kluwer Academic Publishers

Grants Reviewer, National Humanities Center

History Reviewer, American Society of Bioethics and Humanities

Consultant, American Medical Association

Reviewer, *Journal of Medicine and Philosophy*

2000    Reviewer, Cambridge University Press

Reviewer, Rodopi Publishers

Panelist NEH Collaborative Research Projects Program

History Reviewer, American Society of Bioethics and Humanities

2001    Reviewer, Cambridge University Press

Reviewer, Wadsworth

Reviewer, *Journal of Social Philosophy*

2002:    Reviewer: Oxford University Press

Reviewer: *Journal of Medicine and Philosophy*

Consultant:  AHRQ-NEH

Board of Consulting Editors, *Encyclopedia of the Philosophy of Sex*, Greenwood Press.

Consultant judicial conduct revision committee, Supreme Court of Puerto Rico

2003    Reviewer: *Theoretical Medicine and Bioethics*

Reviewer: *American Journal of Bioethics*

Robert Baker, *Vitae*, 2013 page-25

|      | Reviewer: *Journal of Clinical Ethics*                                                |
|------|---------------------------------------------------------------------------------------|
| 2004 | Reviewer *American Journal of Bioethics*                                              |
|      | Grants Reviewer, the Wellcome Trust (Bioethics)                                       |
|      | Reviewer, Routledge (UK)                                                              |
| 2005 | NIH, National Library of Medicine Panel Reviewer                                      |
|      | External Program Reviewer:  Department of Medical Humanities, E. Carolina University. |
|      | Reviewer *American Journal of Bioethics, Developing World Bioethics*                  |
| 2006 | Reviewer:  *American Journal of Bioethics*                                            |
|      | Expert panelist: National Science Advisory Board for Biosecurity (NSABB)              |
|      | Reviewer, *Bulletin History of Medicine*                                              |
| 2007 | Reviewer, ASBH  (History)                                                             |
|      | Reviewer, Palgave/Macmillan                                                           |
|      | Reviewer, Oxford University Press                                                     |
|      | Reviewer, *Ethics & International Affairs*, Carnegie Council, New York                |
|      | Reviewer, *Kennedy Institute of Ethics Journal*                                       |
| 2008 | Panel reviewer:  NIH National Library of Medicine                                     |
|      | ASBH  (History of Medical Ethics papers, national conference)                         |
|      | Reviewer: *Bioethics*                                                                 |
|      | Reviewer: *Kennedy Institute of Ethics Journal*                                       |
|      | External Reviewer for Tenure and Promotion,                                           |
|      |       McGill University (Department of Medical Ethics),                                |
|      |       University of Rochester, Division of Medical Humanities, Ethics and Palliative Care |
| 2009 | Wake Forest University: External Reviewer of Center Proposal                          |
|      | *Bioethics*                                                                           |
|      | *Kennedy Institute of Ethics Journal*                                                 |

2010  Articles, manuscripts, grant proposals reviewed for

- *Bioethics.*
-  *Kennedy Institute of Ethics Journal*
- National Institutes of Health/National Library of Medicine
- Oxford University Press,
- Wellcome Trust

2011 Articles, manuscripts, grant proposals reviewed for
- *Bioethics*
- National Institutes of Health

Robert Baker, *Vitae*, 2013 page-26

- National Library of Medicine

- Oxford University Press

- *Annals of Internal Medicine*

2012 Articles, manuscripts, grant proposals and tenure candidate scholarship reviewed for

- *American Journal of Bioethics*

- American Society for Bioethics and Humanities

- *Bioethics*

- UNESCO Bioethics Education Committee

- Scientific Committee ICCEC 2013 International Conference for Clinical Ethics Consultation

- Tenure Reviewer U. Purdue/Fort Wayne

- National Library of Medicine (NIH) Scholarly Works Grants Review

- (Oct) Tenure reviewer UNC Charlotte

- (Nov) *Journal of Race and Social Problems*

- (Nov) Oxford University Press x 2 manuscripts

- (Nov) *Developing World Bioethics*

2013 Articles, manuscripts, grant proposals and tenure candidate scholarship reviewed for

- Wheaton College—tenure review

- Reviewer for Ethiek en Gezondheid 2012-2015 (Netherlands).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 30th day of March, 2016, the foregoing Brief of the American Civil Liberties Union, American Civil Liberties Union of Utah, American Civil Liberties Union of Colorado, American Civil Liberties Union of Kansas, American Civil Liberties Union of Oklahoma, and American Civil Liberties Union of Wyoming as *Amici Curiae* in Support of Appellants was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. I further certify that seven hard copies of the foregoing brief are being sent to the Court via UPS.

*/s/ Leah Farrell*
Leah Farrell